Argued November 22, 1929; reargued March 18; affirmed September 16; rehearing denied October 14, 1930

KANE ET AL. *v.* KANE ET AL.

(291 P. 785)

*Stephen W. Matthieu* of Portland (John F. Logan, Frank J. Lonergan, both of Portland, on the brief) for appellants.

*James J. Crossley* and *V. A. C. Ahlf,* both of Portland, for respondent.

COSHOW, C. J. The deed executed by plaintiffs to convey the real property involved to defendant Frank P. Kane was sufficient to convey all of the right, title and interest of the grantors in said deed in and to the real property described therein: Or. L., § 9846. No question is raised about the sufficiency in the form or matter of the deed. Plaintiffs rely on an alleged express trust arrangement and the contention that said deed did not express the intention of the parties.

As a true statement of the position of plaintiffs with reference to the deed executed by them to their father, defendant Frank P. Kane, we quote from the testimony of Francis J. Kane:

"Q. Now, what was the circumstances under which this deed was signed? This is a copy of that deed from yourself—

"A. Well, the circumstances—

"Q. Well, look at it and see what it is.

"A. Well, this here was a deed in trust, a quit-claim deed here, which was signed on a Thanksgiving day. There was no consideration, no value received whatsoever. It was a deed in trust for him to have a home there, and when he didn't want a home—I took it there; the deed was handed to him; he was never supposed to record that deed.

"The Court: Tell what was said, not what you supposed. It speaks for itself. Tell us what was said. That is what you have been asked, Mr. Kane. I don't care anything about conclusions, you know.

"Q. (By Mr. Lonergan): State to the Court, Mr. Kane, what conversation there was between you and your father and the other children about that deed. That is all you have to tell.

"A. Well, we decided to take this deed and put this deed in trust for him provided he would pay the taxes on that place, which he agreed to do on that day. After leaving there—

"Q. Well, state whether or not it was supposed to come back to the children?

"A. Absolutely; positively.

&ast; &ast; &ast; &ast; &ast;

"Q. (By Mr. Lonergan): What was said between you and your father?

"A. Well, what was said there, 'If you take and keep it up, and pay the taxes,' as long as he made his home there, and when he didn't want a home it was to revert right back to those children. That is clear enough."

There is considerable conflict in the details of the testimony on the part of the plaintiffs, but in one particular they agree and that particular is that defendant Frank P. Kane was to have the right to the land described in the deed for his use and benefit for life. In his cross-examination the witness Francis J. Kane

testified that he told defendant Alice W. Kane that "this is a deed (referring to the quit-claim deed from plaintiffs to defendant Frank P. Kane) of trust." "I told her, I says, 'That property will go back,' I says, 'right to where it reverted from on that deed of trust,' I says, 'That is where it will go'." The witness stated this conversation occurred on the day his father and the said Alice W. Kane returned to their home immediately after their marriage. As stated above, I repeat that the quit-claim deed is an ordinary quit-claim deed without any limitations, qualifications or restrictions. The learned attorneys for plaintiffs state their position in their brief as follows:

"It was agreed that this deed should not be put on record and that Frank P. Kane should have no beneficial interest in the property, but that he should hold the unrecorded deed rather as evidence of permission and license that the plaintiffs had given him to use such interest as they might have in the property."

The attorney who prepared the quit-claim deed represented the estate of the mother. All of the parties seem to recognize that the father had some interest in the property. There is no pretense whatever that any undue influence or persuasion was used by him to procure the deed. Plaintiffs claim their father expressed a fear that some of his children might sell their interest and jeopardize his possession. To prevent that they executed and delivered the deed. They claim to have executed the deed so as to secure to their father a home for life or as long as he wanted it for a home. There is no evidence of a trust, but rather a desire to convey a life estate. It would have been a very simple transaction to have prepared a lease or other document to effect an intention to pass a life estate. The attorney testified that he drew just what

he was asked to draw in the way of a conveyance. One or more of the plaintiffs requested the attorney to draw the deed.

After the deed was executed and certified, plaintiff Francis J. Kane took the deed and delivered it to his father, defendant Frank P. Kane. Thus, we have a deed executed, acknowledged, certified and delivered voluntarily by the plaintiffs. That deed was sufficient to convey, and did convey, all the interest that the grantors therein named owned in and to the property therein described. The title thus conveyed can not be questioned by oral testimony of the intent of the parties. They testify among other things that defendant Frank P. Kane agreed not to put the deed on record. The deed was not put on record until after the marriage. But that can make no difference in passing the title. The deed was delivered, fully executed and the title passed with its delivery: *Moore v. Thomas,* 1 Or. 201; *Bliss v. Miller,* 119 Or. 573, 581 (250 P. 218, 763). Defendant Frank P. Kane was in possession and his ownership of the property was thereby protected. He had the written evidence of his ownership and the physical possession of the property. These two evince his ownership and make his title complete: Or. L., §§ 712, 713; *Ambrose v. Huntington,* 34 Or. 484, 488 (56 P. 513).

The only consideration expressed in the quit-claim deed is one dollar. The witnesses in behalf of plaintiffs testified that no consideration was paid. They testified that defendant Frank P. Kane agreed to keep the taxes paid and maintain the property in good repair. Plaintiffs will not be heard, however, to dispute the recital of consideration, so as to vitiate their deed: Or. L., § 798, subd. 3; *Marks v. Twohy Bros. Co.,* 98 Or. 514, 528 (194 P. 675). Plaintiffs will not be heard to con-

trovert the habendum in their deed: Or. L., § 798, subd. 3; *Lange v. Allen,* 120 Or. 96, 103 (251 P. 715).

The deed from plaintiffs to defendant Frank P. Kane is not ambiguous. Plaintiffs do not claim that the deed was procured by fraud. No pretense is made that any mistake entered into the preparation, execution or delivery of the deed. The deed was prepared after the discussions between defendant Frank P. Kane and plaintiffs. Whatever agreement or understanding was entered into merged in the deed when it was executed. It is elementary law that the deed represented the intention of the parties and that all prior discussion merged in the deed when it was executed and delivered.

"When the terms of an agreement have been reduced to writing by the parties, it is to be considered as containing all those terms, and therefore there can be, between the parties and their representatives or successors in interest, no evidence of the terms of the agreement, other than the contents of the writing, except in the following cases": Or. L., § 713.

Then follows two exceptions, neither of which is applicable to the case at bar: *Sutherlin v. Bloomer,* 50 Or. 398, 406 (93 P. 135); *Lange v. Allen,* above; *Jaloff v. United Auto Indemnity Exchange,* 120 Or. 381, 387-8 (250 P. 717); *Thomson v. Silsby,* 120 Or. 501, 506-7 (252 P. 712). See *Hyland v. Oregon Agricultural Co.,* 111 Or. 212, 217 (225 P. 728), in which Mr. Justice RAND used the following language:

"It is a substantive rule of law that as between the original parties to a contract and their privies, in the absence of fraud, mistake in fact or illegality in the subject-matter of the contract, where the parties have entered into a contract which is complete in itself and which has been reduced to writing, it is 'conclusively presumed that the whole engagement of the parties, and the extent and manner of their under-

taking, was reduced to writing'; and that parol evidence, that is, evidence extrinsic to the writing itself, is inadmissible for the purpose of adding to, subtracting from, altering, varying or contradicting the terms of the written contract or to control its legal operation or effect, and that all oral negotiations or stipulations between the parties preceding or accompanying the execution of the written contract are regarded as merged in it." (Large number of authorities cited.)

The evidence of the oral agreement was properly and timely objected to. There was, then, no legal evidence before the court of any agreement that the defendant Frank P. Kane held title to the land in controversy as trustee.

Plaintiffs rely on *De Vol v. Citizens' Bank*, 92 Or. 606 (179 P. 282; 181 P. 985). That case differs from the instant case in this, the trustee in the De Vol case executed the alleged trust while she held the title. The learned justice writing the opinion expressed the principle thus:

"* * * The transaction between Mary De Vol and her brother, became in the nature of an executed trust. She held the property subject to his use and disposition, and upon his order and request, she signed the deed to Whitmer in full recognition of the parol trust. Under such circumstances, and when the trust has been so acknowledged and executed, the reason for the rule against admitting parol evidence fails, and when the reason fails the rule fails with it." Citing 1 Perry on Trusts (6th Ed.), § 82; Beach on Trusts, § 39.

In *Chance v. Weston*, 96 Or. 390, 395 (190 P. 155), this court, speaking through Mr. Justice BEAN, stated the ruling principle thus:

"The power, if any, given to the defendant bank to convey the real estate to the three daughters was given by parol, and was void under the statute of frauds.

The deed executed by the bank to three of the defendants after the death of Laura I. Chance was executed without authority. A trust in real estate can not be created by parol: *De Vol v. Citizens' Bank,* 92 Or. 606 (179 P. 282, 181 P. 985)." Citing other authorities.

Plaintiffs also rely on *Templeton v. Hollinshead,* 119 Or. 620, 624 (250 P. 747), and the quotation therefrom from 3 Pomeroy's Equity Jurisprudence (4th Ed.), § 1053. This case and the citation has reference to constructive trusts. Plaintiffs rely on an express trust. The quotation from 3 Pomeroy's Equity Jurisprudence is not apt nor pertinent. This is the language there expressed:

"In general, whenever the legal right to property, real or personal, has been obtained through actual fraud, misrepresentations, concealments, or through undue influence, duress, taking advantage of one's weakness or necessities, or through any other similar means or under any other similar circumstances which render it unconscientious for the holder of the legal title to retain and enjoy the beneficial interest, equity impresses a constructive trust on the property thus acquired in favor of the one who is truly and equitably entitled to the same * * *."

In the instant case there is no pretense that any of the unfair methods stated in the excerpt from Pomeroy's Equity Jurisprudence were employed or used. This court said in *Metzger v. Guynup,* 125 Or. 507, 513 (265 P. 420):

"The law is well settled that one who procures the execution of a deed by misrepresentation with intent to deceive and defraud a person will be held a trustee *ex maleficio.*"

If the instant case disclosed that the defendant Frank P. Kane procured the deed by misrepresentations there would be no trouble in annulling the deed

from plaintiffs to defendant. But there is no evidence or indication of any deceit, any fraud or any misrepresentations having been used by defendant Frank P. Kane on plaintiffs, inducing them to make the transfer. Hence, there is no place for testimony concerning an oral contract or oral understanding between them prior to the execution of the deed.

Other jurisdictions support this opinion: *Price v. Brown,* 4 S. C. 144, 151; *Waters v. Hall,* 218 App. Div. 149 (218 N. Y. S. 31); *Straw v. Mower,* 99 Vt. 56 (130 Atl. 687); *Smith v. Howell,* 3 Stockton's Reports (11 N. J. Eq.) 349, 359; *Cain v. Cox,* 23 W. Va. 594, 604; 1 Perry on Trusts and Trustees (6th Ed.), 68-71, § 76; *Goff v. Goff,* 98 Kan. 201, 204 (156 P. 26); *Thomas v. Robbert,* 123 Misc. Rep. 76 (204 N. Y. S. 217, 218).

Every case referred to by plaintiffs, or others, intending to support plaintiffs' contentions where a parol agreement of a trust has been enforced has been based on fraud or mistake, part performance or the execution of the alleged trust by the trustee, or a declaration of trust executed voluntarily by the alleged trustee while he held the legal title. It is claimed that defendant Frank P. Kane executed what is equivalent to a declaration of trust. The only instrument of that kind is a warranty deed executed by him two years after he had conveyed his interest to his then wife. A declaration of trust or other instrument or an attempt to execute a trust must be performed while the trustee has title to the property. A case cited as in support of the alleged trust in the instant case is *Bicocchi v. Casey-Swasey Co.,* 91 Tex. 259 (42 S. W. 963, 66 Am. St. Rep. 875). An examination of the last case cited clearly discloses that the parties seeking to establish a trust relied on fraud. Among other things

the court said in page 881, which states the principle of law upon which I am relying as follows:

"We conclude that the correct rule, and that which is supported by authority and sound reasoning, is that, when the fraudulent grantee has, in compliance with his verbal agreement, made a reconveyance of the property to the fraudulent grantor, the moral obligation under which he placed himself to make this reconveyance is a valuable and sufficient consideration to support the deed of reconveyance. *While the legal title to the property remained in Mazza,* his creditors might have subjected it to the payment of their debts, and if they had taken proceedings by which they fixed a lien upon the property before the conveyance was made, their rights would be superior to those of Bicocchi, but, having failed to secure any right in the property itself before the conveyance was made, they can not now reach it in the hands of Bicocchi, because his right to have the property reconveyed was equally binding as were the rights of the creditors of Mazza to have their debts paid; and Mazza having conveyed the property in satisfaction of a promise to do so, that conveyance must be held to be good against the debts of the defendants in error."

The warranty deed is not a declaration of a trust, but an attempt to make a reconveyance. If plaintiffs' evidence proved a trust, defendant Frank P. Kane should not have executed a warranty deed. If Frank P. Kane's title was encumbered with a trust he could not covenant against encumbrances, nor truthfully claim to be the absolute owner in fee. If plaintiffs' claim is true, their father had a life estate in the land. The life estate at least was conveyed to defendant Alice W. Kane, for that deed conveyed all the interest Frank P. Kane had in the land. If the deed from plaintiffs to Frank P. Kane should be annulled, Frank P. Kane would own his curtesy in the land which would pass to Alice W. Kane by the deed in her favor. That

life estate constituted an encumbrance. The warranty deed is a direct denial of a trust estate. The recitals in the warranty deed preclude defendant Frank P. Kane from claiming that his title to the land was conditional, encumbered or in any way differed from the recitals, including the covenants of ownership and against encumbrances in the deed. If defendant Frank P. Kane promised not to record his deed and broke that promise, he did not thereby declare a trust. Breach of a parol agreement does not create a trust: 1 Perry on Trusts (6th Ed.), § 76. Those who seek equity must do equity. Plaintiffs concede they intended to grant a life estate to their father. Now they are asking the court in the prayer of their complaint "and that each and both of the defendants be declared to have *no interest whatsoever* in said property." That plaintiffs are not seeking to do equity appears from what follows:

It is claimed that the defendant Alice W. Kane had notice of the trust agreement. The evidence upon which they rely on that behalf is set out above. Since there was no trust agreement, there could not be notice of such. The lower court found the evidence indicated not a trust agreement but a life interest in so far as the evidence was admissible to prove anything. In that finding I concur. The letter hereinafter set out from the attorney does not give notice of trust. On the contrary, the purpose is that by reason of the marriage defendant Mrs. Kane would have some interest which would cause complications. She did have an inchoate dower interest.

Mr. Van Hoomissen writes "since the title stands in your name the law perhaps would cause complications to arise as to the rights of Mrs. Kane." That does not indicate that he was referring to a trust, nor

is it any notice to Mrs. Kane that there was a trust agreement. It undoubtedly refers to the interest Mrs. Kane had in the property as the wife of defendant Frank P. Kane by operation of law.

The only evidence adduced by plaintiffs in support of their allegations of fraud is the fact that defendant Frank P. Kane executed and delivered the deed conveying said premises to his wife, the defendant Alice W. Kane, within a month after they were married to each other; and the testimony of defendant Frank P. Kane that he signed that deed without knowing what the instrument was, because he was told by her to sign the instrument and that said instrument was reconveying the property to his children, the plaintiffs. She disputes the testimony of defendant and denies that she was present when he executed the deed. She adduced testimony of several witnesses who testified that defendant Frank P. Kane stated that he had deeded the property to his wife, the defendant Alice W. Kane. Mr. James J. Crossley, one of the attorneys for defendant Alice W. Kane, corroborates her to the extent that he prepared the deed at the request of the defendant Frank P. Kane; that his wife was not present when the deed was executed by said Kane; that he read the deed carefully to said Frank P. Kane and after having read it to him he assented to the deed as being according to his intentions. The stenographer in the office of the said Crossley also corroborated defendant Alice W. Kane to this extent that she was not present when Frank P. Kane executed the deed. The evidence is overwhelming that he deliberately executed the deed to Alice W. Kane. He acted very foolishly but that does not justify overturning the law.

Parties relying on fraud to void an instrument must prove their allegations of fraud. It is settled in this

jurisdiction that fraud is never presumed. It is significant in the light of the evidence of some three disinterested witnesses to the effect that defendant Frank P. Kane soon after delivering the deed had told them he had conveyed the premises to his wife, defendant Alice W. Kane, and to one or more of them stated his reason for his act. We can not believe his testimony that he did not know what he was signing when he signed the deed, or that he thought he was conveying the land to plaintiffs.

Among other things they caused their attorney Mr. Van Hoomissen to write the following letter to the defendant Frank P. Kane:

"Joseph Van Hoomissen
Attorney-at-Law
301-3 Dekum Building
Portland, Oregon
Office Phone Broadway 6649

April 17, 1925.

"Mr. Frank Kane
894 E. Caruthers St.
Portland, Oregon.

"Dear Mr. Kane:

"The matter of your recent marriage in relation to the property which was left by Mrs. Elizabeth Kane to yourself and to your children has occasioned your children interviewing me as to rectifying the present status of the title of said estate, that is to say, since the title stands in your name the law perhaps would cause complications to arise as to the rights of Mrs. Kane, which would be contrary to the understanding at the time the children conveyed their interest to you.

"In any event, Mr. Kane, I am in a position where the children sort of blame me for the present status and look to me for its adjustment, therefore, before I make any further decision I would greatly appreciate

it if you would call at my office at your earliest opportunity and discuss this with me.

"Respectfully yours,
"Jas. Van Hoomissen."

J. CH.EE

Its date shows the letter was written within two days after the marriage of the defendants to each other. According to the testimony of all of the plaintiffs in regard to their intention, that intention was to give to their father the possession and use of the real property during his lifetime, except that plaintiff Francis J. Kane said he was to have it for as long as he wanted it for a home. Plaintiffs demand in their complaint "that each and both of defendants be declared to have no interest whatsoever in said property."

Plaintiff Francis J. Kane was administrator of his mother's estate. Said property was the home of defendant Frank P. Kane and his deceased wife. It was their actual place of abode. Plaintiffs attempted to include the furniture in that home as having been delivered to their father under the alleged trust arrangement. We are not advised how much of said furniture was exempt. In all probability all the furniture belonged to defendant Frank P. Kane and his deceased wife during her lifetime and was exempt from execution. Under the law it was the duty of the probate court of Multnomah county to set the furniture aside to defendant Frank P. Kane as exempt property: Or. L., § 1234. It was the duty of plaintiff Francis J. Kane to have petitioned the court for an order to set aside the exempt property to the surviving husband, defendant Frank P. Kane.

The property in litigation constituted the statutory homestead. As the surviving spouse, defendant Frank P. Kane had his homestead interest and rights in the

property: Or. L., §§ 221-225. As the surviving spouse he was also entitled to his curtesy interest in that property. All these interests seem to have been ignored by plaintiffs. There is no competent evidence in the record to support a trust.

I have been unable to find any evidence tending to prove that defendant Frank P. Kane promised his children, the plaintiffs, to hold the title in trust for them or to return the title to them. Plaintiffs testify only that there was an understanding that the property would revert to them. There were expressions that were indicative that plaintiffs held the opinion that the property would be theirs when their father got through with it. No one contemplated at that time that their father, the defendant Frank P. Kane, would remarry. If the father had died without remarrying, the property would have gone to the children. That was the understanding and was the true condition at the time the deed from plaintiffs conveying the property to their father was made, but there is no other evidence of any agreement to that effect.

It is further claimed that because the quit-claim deed from plaintiffs to defendant Frank P. Kane was not of record and was not to be put of record, as plaintiffs claim, therefore, the deed was held in trust. But that was not evidence of a trust agreement. The testimony of Mr. Van Hoomissen was to the effect that it was understood between them that the property belonged to plaintiffs all the time. If the deed was held without recordation, with the understanding that plaintiffs owned the property, then the natural thing for plaintiffs to have done when they learned their father was to be married would have been to go to him and demand the return of that deed. The return of the unrecorded deed would have resulted in destroying the

evidence of a conveyance from plaintiffs to defendant Frank P. Kane. Plaintiffs did not take that course. The evidence in behalf of plaintiffs indicate that their intent to claim a trust or to nullify their own deed duly executed and delivered is an afterthought and an effort on their part to overcome the result of a careless manner of dealing with their property.

The position of plaintiffs can not be sustained without doing violence to the law in the following particulars:

First, it would be necessary to admit evidence to contradict the written agreement of the parties as expressed in the quit-claim deed: Or. L., § 712, prohibits the admission of testimony to contradict a deed.

Second, it would be necessary to consider oral testimony to express the intention of the parties to the deed. When there is no ambiguity or uncertainty in the terms of a deed it is an elementary rule of law established, after the experience of centuries, that evidence to explain or prove the intention of the parties in a written document free from ambiguity is inadmissible. In a recent case, *Miller v. Paul,* 237 Ill. App. 166, the court expressed the principle in this language:

"Oral testimony was introduced in this case, by appellants, tending to vary and contradict the written terms and covenants of the notes and mortgage, over the objections of appellee. It is not necessary to cite cases adhering to the elementary rule that this can not be done unless such testimony is based upon some equity like fraud, accident or mistake, rendering the instrument defective or void. The law is that where there is no ambiguity in the terms used or where the language of the instrument has a settled meaning, the instrument itself is the only criterion of the intention of the parties and its construction can not be explained by oral evidence: *Wilson v. Wilson,* 268 Ill. 270, 109 N. E. 36."

Third, it would be necessary to admit testimony of the negotiations leading up to the execution and delivery of the deed contradicting the effect of the deed: Or. L., § 713, prohibits that being done. All of the prior negotiations merged in the deed.

Fourth, it would be necessary to consider the testimony of Mr. Van Hoomissen to the effect that notwithstanding the deed of conveyance from plaintiffs to defendant Frank P. Kane it was not intended to convey land at all. Van Hoomissen testified that the property was considered to belong to plaintiffs all the time. In effect, that means that the plaintiffs "had their fingers crossed" when they conveyed the land to their father: Or. L., §§ 715, 798, subd. 3, forbids such a construction of the deed. Plaintiffs are estopped by said sections from denying the effect of their own deed.

Fifth, it would be necessary to ignore the testimony of Van Hoomissen, who prepared the document, to the effect that he advised them that a quit-claim deed would necessitate administration of the estate when defendant Frank P. Kane died. Notwithstanding that advice and the effect of the deed plaintiffs executed and delivered the deed. The reason they assign for not recording the deed was to avoid the administration of the estate. The thought of a trust never entered the mind or thought of plaintiffs or defendant Frank P. Kane until they were preparing for the lawsuit.

Sixth, it would be necessary to hold, notwithstanding defendant Frank P. Kane had conveyed to his then wife the land involved in this suit, he could by executing a warranty deed in favor of plaintiffs thereby impress a trust on his own deed and that of his grantor. The warranty deed was executed when Frank P. Kane had no interest in the land other than his curtesy

initiate. The warranty deed was an absolute nullity so far as Alice W. Kane is concerned. Its only effect would be to estop defendant Frank P. Kane from asserting his interest flowing from the divorce decree. That interest might pass to the grantees in said warranty deed.

Seventh, it is an elementary principle of law that litigants are bound by their pleadings. Plaintiffs pleaded an express trust. They undertake to establish an express trust by oral testimony. The law requires an express trust in real property to be proven by written testimony: Or. L., § 804.

Another consideration having some weight is this: The learned circuit judge who tried this case has an extensive experience both in the practice of law and in the decision of cases. He is known as an able judge, a just judge, who tries to decide the cases before him in accordance with principles of equity and justice. At the second argument of this case, we were informed that the same judge tried the case between the defendants for the annulment of their marriage. In the divorce case he granted the defendant Frank P. Kane the divorce. The two cases were pending at the same time. The learned trial judge had the witnesses before him and his decision, under the circumstances, should not be disturbed unless clearly contrary to the evidence and the law. He found the equities to be with the defendant Alice W. Kane and assessed the costs and disbursements against the plaintiffs.

The decree should be affirmed.

BEAN and BROWN, JJ., concur.

ROSSMAN, J., dissenting. This is a suit to remove a cloud from the title of a parcel of real property in

which the plaintiffs claim to own a seven-ninths undivided interest, and to secure other incidental equitable relief.

The evidence discloses the following facts: October 22, 1922, Elizabeth Kane died leaving surviving the defendant Frank P. Kane, Sr., who is her widower, and nine children. Eight of the latter are plaintiffs in this suit. There are two defendants: one is the Frank P. Kane, Sr., above mentioned, and the other, who is the respondent Alice Kane, became the wife of Frank P. Kane, Sr., April 14, 1925.

At the time of the mother's death she was the owner of a piece of real property which constituted the family home, and which is the subject-matter of this suit. Following her demise the children and the father proceeded to probate her estate. One of the sons, Frank P. Kane, Jr., became administrator, and Mr. Joseph Van Hoomissen, an atotrney, performed the legal services incident to that proceeding. Apart from the family home, the record does not disclose the extent of the estate, nor what disposition was made of it. The manner in which the parties disposed of the home we shall now relate. The father became interested in knowing what arrangements could be effected so as to assure him a right to its continued occupancy. He was at that time past 66 years of age, illiterate, and partially deaf. He had retired from his occupation as a track greaser upon a pension of $34.35 a month, which constituted substantially his entire income. Thanksgiving day was near at hand, and upon this occasion the family held a reunion, during the course of which the children most of whom had reached the age of majority, readily agreed that the father should occupy the home as long as he cared to do so. Shortly following the reunion the

father and Frank P. Kane, Jr., called upon Mr. Van Hoomissen with the request that he prepare a document which would carry into effect the agreement that the father should have the right of occupancy as long as he had use for the home property. We now quote from Mr. Van Hoomissen's testimony wherein he stated his understanding of the agreement:

"The agreement, as I recall it, Mr. Frank Kane, Jr., and Mr. Kane here, senior—Mr. Frank Kane, Jr., was the administrator,—came to my office shortly after we had prepared the petition for administration, and Mr. Kane, Sr., here, asked me regarding the status of that home, and I explained to him that he had a curtesy interest in the property; that the fee simple title went to the children. And then Mr. Kane, Sr., inquired as to whose duty it was to pay the taxes, and as I recall, my answer to him was that I didn't know any fixed rule regarding the payment of taxes, but I thought that Mr. Kane should pay half of the taxes, and that he should obtain the remaining half of the taxes from the children. Then Mr. Kane said, 'Well, I will pay the taxes, but I want that place as long as I live.' And I told him that he would have that right to have it. And then Frank Kane, Jr., said, 'Well now, Dad'—or this is substantially the words, I don't recall the words,— 'Dad, you will have that as long as you live.' Then some conversation took place. I said, 'Well, supposing some of the children want to sell their interest?' And then Frank spoke up and said, 'Well,' * * * 'Anyway, we can fix that so that you can have it as long as you live, and so long as you feel satisfied that you are living there, and I will pay the taxes and there will be no charge.' And then Mr. Kane, Jr., asked me what could be given there, and I told him any kind of an agreement could be drawn up, and then he spoke to his father about a quit claim deed, and his father seemed satisfied. He says, 'We will give you a quit claim deed,' and then I explained to Mr. Kane that if the title was conveyed to him that when he died it would have to be administered upon, or he could leave his will, and then

I also explained that at that time I only had knowledge of one minor heir; I explained that the interest of this minor could not be in any way affected excepting through guardianship. So he says, 'Well, if all the other children give me a deed, I can live there, and Frank' * * * by the way, Frank Kane, Jr., prior to that time, said, 'We will give you a deed, but you don't record it,' after I raised the objection about the administration. And Mr. Kane, Sr., said that he wouldn't. And after that it was some days after that it took me to get around to the respective heirs to take the acknowledgments, and I got the acknowledgments, and then Mr. Kane, Sr., and Mr. Kane, Jr., came back and got the deed, and I handed it across my desk to Mr. Kane, Sr., and at that time it was understood he wasn't to record it, and they had decided between themselves that when their father died they would tear the deed up. That is the actual agreement. * * *

"Q. Was he to have any beneficial interest in the property other than that you have stated?

"A. Just to live there, live there the rest of his life. That was the interest he was supposed to have.

"Q. And to whom was the property supposed to revert?

"A. It was supposed to be the children's all the time. They gave him this to please him, as the deed really didn't accomplish any purpose, as far as—excepting it satisfied Mr. Kane. Now, that is the actual fact regarding that deed * * *.

"Q. Now, you testified that you made this quit claim deed. Why, at that time, didn't you have a written agreement of some kind establishing a trust, if those were the conditions to be met?

"A. Because this seemed to satisfy the parties.

"Q. Well, under the law, wouldn't you advise a written agreement establishing a trust?

"A. Yes, I did. I advised first—I did advise such an agreement, and because a quit claim deed was simpler, and satisfied Mr. Kane, and seemed to satisfy the

children, there was absolutely complete harmony between all these parties, and they trusted one another, they went ahead and did it that way."

We quote now from the testimony of one of the boys, Anthony Kane:

"* * * We figured if we would sell this property how would Dad have a home to live, and if he had to get out and rent a house with what pension he was getting, he would not be able to live. So we decided to take that property and to create a home for Dad only as long as he lived, and that property was to revert back to us when he was through with it. * * *

"Q. (By Mrs. Ahlf). Did you have any talk at all with Mr. Van Hoomissen after the deed was signed in reference to the title?

"A. Well, no, not in reference to the title. It was considered a deed of trust; we thought we had made a home for Dad. * * * We decided to create a home for him, and it was talked over when it was brought there, was to make a home for him; it was never considered a sale. We never received a dollar for it."

Edward Kane, another of the sons, testified thus:

"A. Well, my mother died and my father was pensioned by the railroad, and he was getting $34 a month. I went to Mr. Van Hoomissen and I found out that he had an interest in it. Well then—he wasn't satisfied with that interest in it: he says, 'Suppose some of the children want to sell out?' So my brother Frank and Mr. Van Hoomissen had this deed of trust there drawn up, that my father was to live in that house as long as he was alive, but when that house—was through with it, it was to revert back to us. * * *

"A. That was to that effect. I had a conversation with my father on a Thanksgiving day in the dining room at home. We had signed this over on a deed of trust to him without receiving any money, or putting my sister's children or Joe's name down on the place. In that way it would make it a deed of trust: he should pay the taxes, but when he died, it was to revert back to us children."

Frank Kane, who was the son who acted as administrator, testified:

"A. Well, this here was a deed in trust, a quit claim deed here, which was signed on a Thanksgiving day. There was no consideration, no value received whatsoever. It was a deed in trust for him to have a home there, and when he didn't want a home—I took it there, the deed was handed to him; he was never supposed to record that deed * * *.

"A. Well, we decided to take this deed and put this deed in trust for him provided he would pay the taxes on that place, which he agreed to do on that day. After leaving there—

"Q. Well, state whether or not it was supposed to come back to the children?

"A. Absolutely; positively.

"Q. Well, what was the agreement regarding that? The Court: "What was said?

"Q. (By Mr. Lonergan): What was said between you and your father?

"A. Well, what was said there, 'If you take and keep it up, and pay the taxes,' as long as he made his home there, and when he didn't want a home it was to revert right back to those children. That is clear enough."

Due to the fact that two of the heirs were minors only seven of the nine signed the above described deed. Upon its execution it was delivered to the father; obedient to his promise he refrained from having it recorded.

We shall quote no further from the portions of the record which support the plaintiff's contentions that the conveyance to the father was intended to invest him with a beneficial interest to no more than a life estate in this property. The testimony, which we have mentioned and quoted in part, is corroborated by that of the father and by the rest of the children who testi-

fied. Thus the alleged trustee, the beneficiaries of the alleged trust, and the attorney who prepared the conveyance, are united in their testimony to the effect, that while the deed was intended to convey to the father the interest of the seven children who signed it, the grantee's beneficial interest should be confined to the period for which the father used the property as a home. In fact, no one testified to the contrary. Two witnesses, friends of the respondent, recounted some remarks made by the father shortly after his marriage to her, wherein he referred to the property as ''my property.'' These loose remarks, however, were made at a time when he was displeased with his sons; in addition he possibly did not intend, by referring to the property as ''my property,'' to define the nature of his estate. The words ''my property'' may have been used as the equivalent of ''my home.'' Apart from these loose remarks the testimony is overwhelming and, as previously stated, uncontradicted that the deed was not intended to invest the father with the beneficial use of the entire fee. Possibly a suspicion may arise that this limitation upon the conveyed estate is an afterthought, and it may find some support in the fact that an attorney prepared the deed. But the testimony of Mr. Van Hoomissen, who is a man well worthy of belief, dispels any suspicion that might arise from the fact that a deed rather than an instrument of trust was employed. He found a situation where all had agreed upon a quitclaim deed coupled with a parol agreement limiting the father's beneficial interest. In addition all interested in the transaction were members of the same family and possessed full confidence in one another. The father was an old man, retired from active life, who sought the repose of a home. Under such circumstances all

were justified in accepting his promises without the formality of a written declaration. When a family of 10 members have agreed upon a simple plan for handling a minor transaction, which concerns only them, an attorney may be pardoned for refraining from suggesting another plan, especially when to do so would require an explanation of the law to a man who could neither read nor write, and was partially deaf. In fact, the plan adopted here was appropriate in part; it would have met all of the requirements of our laws had Mr. Van Hoomissen caused the father to execute a declaration of trust. The trust was not void on account of that omission, as we shall later see. And since all of the children placed full confidence in the father's oral declaration we dismiss as unwarranted the suggestion that the limitation upon the conveyance is an afterthought. From Perry on Trusts (6th Ed.), § 82, we quote:

"Any agreement or contract in writing, made by a person having the power of disposal over property, whereby such person agrees or directs that a particular parcel of property or a certain fund shall be held or dealt with in a particular manner for the benefit of another, in a court of equity raises a trust in favor of such other person against the person making such agreement, or any other person claiming under him voluntarily or with notice;".

We conclude that while the deed conveyed to its grantee an undivided seven-ninths interest in the fee, the father's beneficial interest was limited to the period in which he would occupy the property as a home. We are satisfied that under the circumstances the transaction contemplated that the father should hold the balance of the conveyed estate in trust for his grantors.

We come now to the next chapter, which had its inception in the father's marriage to the respondent. Until that event occurred on the 14th day of April, 1925, the father and some of the unmarried boys had continued to reside in the home, and nothing had taken place to disturb their agreement. But when the father remarried some of the plaintiffs felt alarmed lest the small estate which they believed their mother "intended them to have might be diverted to this woman." In order that the respondent would be apprised of their interest in the property, one, possibly two, of the plaintiffs called upon her some days before the marriage and explained to her that the father had a limited estate only in the home. Some days after the wedding some of the children explained to the respondent the details of their conveyance to their father, and the effect which they claimed for it. About this time some of the boys called upon Mr. Van Hoomissen and inquired whether this reserved interest in the property might be lost through this unanticipated event. April 18, 1925, Mr. Van Hoomissen mailed a letter to the father which mentioned the anxiety of the boys concerning their interest in the property since the remarriage. We quote from the letter the following:

"The matter of your recent marriage in relation to the property which was left by Mrs. Elizabeth Kane to yourself and to your children has occasioned your children interviewing me as to rectifying the present status of the title of said estate, that is to say, since the title stands in your name the law perhaps would cause complications to arise as to the rights of Mrs. Kane, which would be contrary to the understanding at the time the children conveyed their interest to you."

The concluding portion of the letter mentioned that the children blamed Mr. Van Hoomissen for the

jeopardy in which their interest in the property had been placed, and asked Mr. Kane to "call at my office at your earliest opportunity and discuss this with me." The respondent concedes that she read this letter. Her occasion for doing so was Mr. Kane's inability to read it. The respondent testified that the receipt of this letter angered Mr. Kane and caused him to mention the claims of his sons to the home property; in this outburst he did not deny the validity of their claims. All of this testimony charging the respondent with notice of the children's interest in the property is undenied; in fact, the respondent's testimony confirms it in part.

It is very apparent that the efforts of the boys to charge the respondent with notice of their claims angered their father. He spoke of them as being "bohunks," and finally had the respondent send for an attorney. Instead of getting Mr. Van Hoomissen, the respondent sent for another with whom she had an acquaintanceship. At the conclusion of the conference, which took place in the home, the attorney returned to his office followed by Mr. Kane, and the latter was followed in a few minutes by the respondent. Before going to the attorney's office Kane got all of his valuable papers; these he took with him. Upon this occasion Kane signed a deed, which was at once delivered to the respondent and recorded; it transferred to the latter the title to the home. Kane claims that in the execution of this instrument he was defrauded. Since the testimony upon this issue is in conflict, we shall accept the findings of the circuit court as our own that this charge is not supported by the evidence. Kane testified that while at the attorney's office he was told "sign here—sign there." Evidently this portion of his

testimony is true because before he left the attorney's office he had conveyed to his bride of three weeks his home, another property outside of Portland, two policies of insurance and had also signed a document which was intended to transfer to her several hundred dollars. Thus, in a fit of anger, precipitated by the action of the boys in asserting an interest in the family home this old man conveyed to a bride of three weeks the savings of a lifetime of hard toil. For all of this he received as consideration $10 and "love and affection," according to respondent's testimony. The respondent freely concedes that her new mate made to her the above conveyances; she testified: "Well, he handed me a bunch of papers." The home was worth, possibly $4,000; the value of the other property is not disclosed by the record.

We have mentioned the fact that the respondent claims that she gave Kane $10 as consideration for the deed to the home. The latter denies that assertion. The circumstances follow. Mrs. Kane claims that she was entirely unfamiliar with Kane's intention to transfer the home and his other belongings to her; she testified that all of these conveyances came to her as a surprise. When the deed to the home was handed to her in the attorney's office she claims that she reached into her purse, and finding $10 handed it to her husband. The fact that the deed recited a consideration of $10 she regarded as a coincidence to her act. Having handed Kane the $10 and having come into possession of these properties, the respondent, before leaving the attorney's office directed him to prepare for her a will. As a part of the incidents, just mentioned, the deeds from the boys to the father and from the latter to the respondent were recorded.

We come now to the concluding chapter. Approximately two years after the marriage respondent sued Kane for a divorce; this suit culminated in a decree for the father. In this period of time the latter repented for the wrong he had done when he delivered to the respondent his deed to her. He first endeavored to persuade his wife to convey to the boys; when his request was ignored he executed a deed, which had as its subject-matter this property, and delivered it to the plaintiffs. This is the deed which they rely upon. They contend that its effect was to render admissible the oral testimony which we have reviewed.

The Statute of Frauds is the chief defense urged by respondent. It, however, is not pleaded. It will be observed that in the present instance this defense is purely technical; we feel justified in making this statement because the oral testimony is practically uncontradicted. It remains to be seen whether this defense places upon the plaintiffs a handicap they can not surmount and enables the respondent to keep a property which she knew did not belong to the individual from whom she took her conveyance. In fact, she does not claim that he owned it; but confines her contentions to an assertion that by reason of the Statute of Frauds the plaintiffs are unable to prove their title.

Oral trusts are not nullities; public policy does not demand that the court should find that they amount to nothing. From 26 R. C. L., Trusts, § 31, p. 1195, we quote: "A parol trust is not, however, an absolute nullity, but is simply void at the election of the trustee. If he executes it, the courts will protect him in so doing and as far as possible will protect the beneficiaries in the enjoyment of the fruits thereof. And so the defense that a trust is void under the Statute of Frauds must

be left to the party charged with the trust, and those holding under such party." From Perry on Trusts, (6th Ed.), § 76, we quote:

"A parol trust is not, however, an absolute nullity in any case, but rests in the election of the trustee in those cases where the cestui can not enforce it. The courts will protect the trustee in the execution of the trust if he chooses so to do, * * *."

The plaintiffs, in endeavoring to sustain their title to the property, rely upon the principles above stated and also upon their application as illustrated in the following decisions: *Richmond v. Bloch,* 36 Or. 590 (60 P. 385), and *De Vol v. Citizens' Bank,* 92 Or. 606 (179 P. 282, 181 P. 985). They contend that when the father delivered his deed of reconveyance he thereby, in performing his trust duty, waived the defense of the Statute of Frauds, and recognized the trust as a valid one. While we are inclined to believe that this principle has application to the facts before us, and that under it the plaintiffs are entitled to relief, we prefer to rest our decision upon a principle of equity jurisprudence which, we believe, is more clearly applicable.

Whether or not an oral trust is a nullity, one who has received title to a piece of real property, pursuant to his promise to reconvey upon request, and has repudiated his agreement because it was not reduced to writing, will be unjustly enriched by his breach of good faith if he is permitted to keep the property. In the case before us the respondent, who is now in possession of the property, obtained her conveyance from one whom she knew owned only a limited beneficial interest in it. She knew that her grantor had accepted the conveyance pursuant to the terms of an oral trust. A grantor who conveys land to another under a parol trust, if for the sake of convenience we

may be permitted to use that term, can not obtain a decree for the performance of the agreement, due to the policy which is enunciated by the Statute of Frauds; but when the trustee renounces the oral agreement, pursuant to which the conveyance was made, and proposes to keep the property, it is difficult to understand why he should be permitted to employ the Statute of Frauds as a means of unjustly enriching himself. The statute was never intended to perpetrate frauds, nor to legalize the title of wrongdoers. It is a weapon of defense intended to be unsheathed to save one from an unjust loss. It is not an instrument by which titles can be won. When a beneficiary under a parol trust seeks to compel the supposed trustee to perform the imperfectly created duty the statute may properly be pleaded as a defense. But these plaintiffs are not asking for the enforcement of a trust; they pray for no affirmative relief. Both the cestui que trustant and the trustee terminated the parol trust when the deed of reconveyance was delivered. This, suit instead of treating the trust as executory, regards it as fully executed. It asks the aid of the court of equity only to restore the status quo by holding as a nullity the deed from the trustee to one who took with notice. It is, in fact, a suit to remove a cloud from the plaintiff's title.

In England and in some of the jurisdictions of this country the courts decree the return of property to a grantor who conveyed to another upon the latter's oral promise to hold to the use of the former, and who subsequently disavowed his promise and claimed absolute ownership. The courts which grant relief under such circumstances adopt the view that to do so is not to enforce the trust, but merely to restore the status quo, or, as one eminent authority states, restituio in

integrum. Pending the return of the property these courts treat the derelict one as holding title under a constructive trust. Relief is granted, because to deny it would permit the alleged trustee to unjustly enrich himself through a breach of faith. Since the Statute of Frauds (Or. L., § 804) does not affect trusts created "by operation of law" it constitutes no obstacle to relief under this doctrine. It has been said by one authority: "The theory of these courts is that they are doing no more violence to the Statute of Frauds by preventing unjust enrichment through the doctrine of constructive trusts in equity than a court of law does violence to the Statute of Frauds in allowing recovery in quasi contract where the Statute of Frauds requires a writing in the sale of goods": 1 Indiana Law Journal, 278. Another writer has pointed out: "The statute forbids going forward; it does not forbid going backward." 37 Harvard Law Rev., 653. Thus, the courts which adopt the foregoing view do not find that the statute is an obstacle when they are undoing the unenforceable trust. For a collection of cases which have employed the aforementioned principle see footnote 21 of 37 Harvard Law Review, 653. The doctrine is ably discussed by eminent scholars in 20 Harvard Law Rev., 549, 12 Michigan Law Review, 423, 535, and 6 Columbia Law Review 326. The weight of American authority is opposed to this doctrine: Perry on Trusts, (7th Ed.), § 181a, and 37 Harvard Law Review, 653, footnote 23. Due to that circumstance and the fact that the American rule, which we shall next consider, warrants relief we shall consider the foregoing doctrine no further.

The American courts demand something more than a mere repudiation of the oral trust agreement which induced the voluntary conveyance. A situation which frequently persuades them to grant relief is revealed

when (1) the conveyance is made to one who sustains a confidential relationship to the grantor and (2) any fact which indicates that the relationship was abused when the conveyance was obtained. The combination of these circumstances is said to establish constructive fraud: Perry on Trusts (7th Ed.), § 181a; 13 Cornell Law Quarterly, 237. The authorities are collected in extensive annotations appearing in 45 A. L. R. 851, 35 A. L. R. 280, and 39 L. R. A. (N. S.) 906. The fact that the grantor solicited the conveyance is always regarded as an important circumstance. The confidential relationship is generally established when it appears that the grantor and the grantee were father and son. The fact that the grantee was in a superior position is frequently a persuasive circumstance. Since the Statute of Frauds does not bar relief when the conveyance was fraudulently obtained it constitutes no obstacle. The application of the parol evidence rule which generally protects the recitals of a consideration and the habendum clause is disposed of in the manner which we shall illustrate by quoting from *Brison v. Brison,* 75 Cal. 525 (17 P. 689, 7 Am. St. Rep. 189):

"Nor does the recital of a consideration stand in the way of the relief. As is well known, it was a settled rule of the early law that if no consideration was expressed or proved a use resulted to the grantor. To prevent this, it became common to make the deed recite a consideration. And while such recital could be contradicted for collateral purposes, it could not be contradicted for the purpose of avoiding the deed (*Farrington v. Barr,* 36 N. H. 89; *Coles v. Soulsby,* 21 Cal. 47; *Rhine v. Ellen,* 36 Cal. 369; *Martin v. Splivado,* 69 Cal. 614); or for the purpose of raising a resulting trust (*Russ v. Mebius,* 16 Cal. 356; *Graves v. Graves,* 29 N. H. 129; *Philbrooke v. Deland,* 16 Me. 412, 413). But this only means that the recital could not be contradicted for the mere purpose of showing a want of consideration. Where fraud is charged, the want of

consideration may be shown in connection with and as part of the fraud. In cases like the present, the confidential relation [merely that of husband and wife] is one circumstance, the parol promise is another, and the want of consideration is a third. In cases of fraud, actual or constructive, no mere form of words which the parties have made use of can shut out inquiry as to the real facts. And this from the necessity of the case. For, as has been pertinently asked, if parol evidence be not admissible, how else can the fraud be shown?''

This court has employed the rule of constructive trusts based upon implied fraud arising out of an abuse of a confidential relation. In *Meek v. Meek,* 79 Or. 579 (156 P. 250), a father, who owned a tract of land, granted a 10-year lease of it to his two sons. Shortly thereafter the father yielded to the solicitations of his son, John, and conveyed title to the two boys upon their oral promise to reconvey at the termination of the lease. Thereafter John procured a quitclaim deed from his brother, and then asserted absolute ownership. Upon the father's suit for a cancelation of his deed to the sons it appeared that they had paid nothing for his conveyance to them. This court in reversing the decree of the circuit court, which had dismissed the suit, granted the relief prayed for. Mr. Justice McBride, speaking for the court, said:

''* * * But plaintiff was not dealing with his sons with reference to the strict legal effect of the transaction, but confidentially and with reference to their relationship to him * * * nor would defendant John Meek be in any better position if he had taken the property, originally intending to keep his promise and later formed and acted upon an intention to break it and hold the title. In a case where confidential relations, such as husband and wife, parent and child, exist, the betrayal of such a confidence itself raises a constructive trust.''

In *Gray v. Beard,* 66 Or. 59 (133 P. 791), the facts were: One S. M. Beard, a man of wealth, had developed the practice of reposing the title of much of his property in the names of others. Upon his death the plaintiffs, who were his residuary legatees, claimed ownership of two parcels of real property, the title of which was vested in the deceased's nephew. In sustaining the decree of the lower court, which was in favor of the plaintiffs, this court held:

"It is contended by counsel for the defendant that there is no evidence to sustain the allegation in the complaint of an express trust, because an express trust must be shown by a writing. The defendant, A. Edgar Beard, received the property in question in trust for S. M. Beard, together with other parcels of real estate which had been sold and conveyed by A. Edgar Beard at the dictation of S. M. Beard, and the proceeds thereof turned over to the latter thereby executing the trust in part. A fiduciary relation is therefore shown to have existed between the defendant and the decedent. * * *

"It is a salutary maxim that the statute against frauds can not be used as a cover for fraud. The complaint also sets forth in detail circumstances which show that there was no gift intended, but that, on the contrary, a trust arose in favor of the grantor on the execution of these deeds. A resulting trust may arise where a conveyance is made without any consideration, and it appears from the circumstances that the grantee was not intended to take beneficially. * * *

"Where the defendant relies upon a voluntary conveyance from a near relative, such as a confiding uncle, and a prima facie case is made out against him, showing that the property conveyed is held by him in trust, and the attendant facts and circumstances and the means of disclosure and explanation are peculiarly within the defendant's cognizance, it devolves upon him to show an entire good faith in the transaction, and prove his title. * * *"

The results in *Chance v. Graham,* 76 Or. 199 (148 P. 63), and *Howard v. Foskett,* 96 Or. 446 (189 P. 396), establish that a voluntary conveyance, together with a confidential relationship, do not create a resulting trust in the absence of proof of an abuse of the confidential relationship.

It must occasionally occur that when relatives who have implicit confidence in the integrity of each other effect a conveyance of real property from one to the other they believe from their past satisfactory relationships that it is unnecessary for them to prepare and execute formal written memorials of their agreements to the same extent as would be appropriate if they were strangers to one another. The fact that under such circumstances near relatives frequently rely upon the family relationship for the security of their property rights, and forego resort to the preparation of legal documents, may be readily gleaned from a perusal of the reported decisions. We quote from the language of Mr. Justice Cardozo in *Sinclair v. Purdy,* 235 N. Y. 245 (255 N. E. 258):

"He found, as he thought, in the bond of kinship a protection as potent as any that could be assured to him by covenants of title. It was 'the case of a confidence induced, not by the bare promise of another, but by the promise and the confidential relation conjoined.' (*Wood v. Rabe,* 96 N. Y. 414, 426.) 'The absence of a formal writing grew out of that very confidence and trust, and was occasioned by it.' (*Goldsmith v. Goldsmith,* 145 N. Y. 313, 318.) In such conditions, the rule in this state is settled that equity will grant relief (*Wood v. Rabe,* supra; *Goldsmith v. Goldsmith,* supra) *Gallagher v. Gallagher,* 135 App. Div. 457 (202 N. Y. 572); *Allen v. Arkenburgh,* 2 App. Div. 458 (158 N. Y. 697). Distinctions are, indeed, to be drawn between cases where property is parted with on the faith of an oral promise, and cases where one without an interest in property before obtains a

promise that an interest will be given to him thereafter (*Leary v. Corvin,* 181 N. Y. 222, 229; Cf. *Amherst College v. Ritch,* 151 N. Y. 282). It is not the promise only, nor the breach only, but unjust enrichment under cover of the relation of confidence, which puts the court in motion.''

In *Landrum v. Landrum,* 62 Tex. Civ. App. 43 (130 S. W. 907), parents executed and delivered to their son a deed; the suit was based upon the contention that the conveyance was a trust and that the grantors, reposing confidence in the grantee, neglected to insert in the deed the words of defeasance. In sustaining the suit the court pointed out:

''\* \* \* But it is further held that equity will relieve on the ground of fraud, when between parties to a conveyance absolute in its terms, there was an agreement that the grantees would hold the property conveyed in trust for the grantor during his life \* \* \* the fraud consisting of a violated promise, and the presumption that but for such promise the grantor would have inserted in the deed the substance of the parol agreement. \* \* \* We think the presumption arising from the transaction is that but for the promise of J. P. Landrum to make the sale and turn the proceeds over to the grantor, a promise which was violated, the grantor would have inserted in the deed some condition of defeasance, or the deed would have been so drawn as to show the true agreement between them. The violated promise, and the assertion of title under the deed after the effort to sell the land had ceased, was, we think, a species of fraud against which equity will relieve (*Clark v. Haney,* 62 Texas 514).''

The record before us fully justifies a finding that at the time of the conveyance from the children to their father they reposed complete confidence in him. In fact, the trust which each confided in the other possibly exceeded that which exists between the ordinary trustee and his cestui que trust. Indeed, we indulge in no extravagant statement when we say that even before

the conveyance this property had taken upon itself a quasi-trust nature. It had been for many years the family home, and upon the mother's death the entire group had come into its ownership. No member of the family would feel under such circumstances that he must become watchful lest another might make a secret profit out of the administration of the home property. It is evident that the boys believed that they could safely entrust their father with a deed of conveyance without demanding a written declaration of trust, or an instrument of defeasance. When he accepted the deed he confirmed their belief in him and represented silently, but nevertheless effectively, that their confidence was not misplaced. Under such circumstances the deed was executed and delivered. If a trustee obtained from his cestui a deed so as to render more effective the administration of the trust, and by the use of representations that it was unnecessary to incorporate in writing their complete agreement lulled the cestui into a state of security, thereby keeping out of writing the stipulations of defeasance, it is clear that his title would be defeasible nevertheless. A trustee will never be permitted to derive a profit from the administration of the trust estate. Similarly the father's limited estate can be shown in the present instance; the confidential relationship effects the same result as the fiduciary relationship in the above illustration.

In our present case we have (1) a confidential relationship, (2) a voluntary conveyance, (3) a breach of faith, and (4) a reconveyance. It is our opinion that these circumstances entitled the plaintiff to the relief prayed for.

There is still another basis for recovery: the doctrine of partial performance. The execution and

delivery of the deed of reconveyance we believe was sufficient to take the case out of the statute of frauds: *Gray v. Beard,* supra, and *Stephens v. Tipton,* 128 Or. 115 (268 P. 1014). The convincing proof that the conveyance was intended to grant to the father only a limited beneficial interest entitled the plaintiff to relief.

From the foregoing it follows that in our opinion Kane's beneficial interest in this property was limited to the period he occupied the house as his home, and that, therefore, his attempted conveyance to the respondent of a greater estate was ineffective. We are not unmindful of the fact that the able judge of the circuit court, who tried this case below, arrived at an opposite conclusion; we are informed in the briefs, however, that in the circuit court the plaintiffs devoted their argument to a contention that the respondent obtained her conveyance by the practice of fraud and practically overlooked the line of reason pursued by us. Under these circumstances we ought not hesitate to grant relief when the plaintiffs are entitled to it.

The beneficial interest of Kane was limited to the time that he cared to occupy the property as a home; the children were attempting to create one for him and not for the respondent. It now develops that the latter and not the father is making a home in this property. Under these circumstances Kane's estate has been terminated.

We are fully aware of the fact that the line of reasoning which we have pursued differs from that suggested by the arguments. It is warranted, however, by the facts disclosed by the evidence, and does no violence to the pleadings.

It follows that in our opinion the plaintiffs are entitled to a decree for the relief prayed for in their complaint.

RAND and BELT, JJ., concur.