Argued March 2, reversed March 21, 1916.

## MEEK v. MEEK.

(156 Pac. 250.)

**Deeds—Cancellation—Fraud—Evidence.**

1. In a suit by a father for the cancellation of a quitclaim deed given by him to two sons on the representation of one of them that he desired it merely to protect the sons during a lease given by the father, and would surrender it at the end of the lease, evidence *held* to show that the son planned the scheme for the purpose of overreaching and defrauding his father out of the title to the property.

**Deeds—Cancellation—Constructive Fraud—Confidential Relations.**

2. Where a son was given a quitclaim deed by his father, with the understanding that at the expiration of the lease it would be surrendered, the violation of the confidence by the son in refusing to surrender the property is a constructive fraud, even though at the time the deed was executed he had no actual fraudulent intent.

> [As to presumption of undue influence where confidential relations exist between grantor and grantee, see note in 21 Am. St. Rep. 94.]

**Deeds—Cancellation—Variance—Maturity.**

3. Proof that a son stated that he desired his father to give him a quitclaim deed to certain property to protect his lease therein because he feared that a son-in-law would make trouble for him concerning the lease is not a material variance from a complaint, alleging that the request was made because the son feared the father would get into debt, since the fraud consisted in procuring the deed

under an agreement to surrender it, not in stating the reasons for it, and the variance did not mislead the defendant or deprive him of any defense he might have had if the pleadings had been different.

From Josephine: FRANK M. CALKINS, Judge.

Department 1.    Statement by MR. JUSTICE McBRIDE.

This is a suit to set aside and cancel a lease and deed executed by George W. Meek to John and Herbert Meek, his sons, and for other equitable relief, which will be noticed in the opinion. The complaint alleges, in substance, that at and before June 17, 1912, plaintiff was the owner of a certain 40-acre tract of land described in the complaint, and that on the last-named date he executed a lease thereof to his sons, John and Herbert, for a period of 10 years; that the lessees were to cultivate certain parts of the land and to clear other parts, the lessor to receive one third of all the crops produced on the land, or, if sold, one third of the proceeds of such crops; that plaintiff was suffering from injuries sustained by him while working in a mine, which injuries incapacitated him from performing manual labor; and that the lessees entered upon the premises and undertook to carry out their agreements, and did carry them out for about the period of 1 year. It further recites:

"That thereafter, on June 28, 1912, John Meek, stating that he was fearful that the plaintiff would become involved in debt, by reason of his said physical condition, approached the plaintiff herein and suggested to him that, in order to protect said defendants Herbert Meek and John Meek, this plaintiff should sign a quitclaim deed of the premises herein first above described to defendants, in order to protect said premises during the period of the lease. Plaintiff at said time protested that this was unnecessary, as he, the plaintiff, had other property, but the defendant John Meek strenuously insisted on said conveyance,

and so, to satisfy him and keep peace in the family, the plaintiff agreed to and did quitclaim said premises to the defendants upon the express stipulation and understanding that the defendant John and his brother Herbert agree to convey said premises as a whole back to the plaintiff, at the end of the said period of time, free from encumbrances of any kind through their acts; that there was never any consideration given by the defendants to the plaintiff for the transfer of said property, and the said transfer was made solely and wholly ʼat the instance of the defendant John Meek under the circumstances as herein set forth. Plaintiff further alleges that thereafter, on or about the 1st day of September, 1913, the defendant John Meek, by subterfuge and fraud, planned to secure title to a portion of the above-described land belonging to the plaintiff, although said defendant knew that he and his brother only held the deed to said lands in trust for the benefit of plaintiff, and thereafter, on the 8th day of September, 1913, he persuaded and induced Herbert Meek to allow him to convey, by quitclaim, all of said premises to the said Herbert Meek, and that thereafter, on the 8th day of September, 1913, the said defendant joined with his wife, Mabel Meek, and executed a quitclaim deed of the hereinabove described premises, which quitclaim deed of the said premises was thereafter, on September 13, 1913, filed for record by defendant John Meek and was duly recorded by the county clerk of Josephine County, State of Oregon, in book 43, at page 177, thereof; that on or about the same date, during the plaintiff's absence from his home, the said John Meek fraudulently persuaded Herbert Meek and also H. L. Meek, wife of plaintiff, to sign and execute a quitclaim deed of a part of the said leased property to him; that the property which the said John Meek fraudulently induced the said Herbert Meek and H. L. Meek to convey to him by quitclaim deed was a portion of said leased premises. * * Plaintiff avers that in neither of the said quitclaim deeds was there ever any valid consideration given, and John Meek accepted said deed with full notice of, and in fraud of, plaintiff's rights; and that there never was any intent on

part of plaintiff to legally convey the said lands to any of the parties, or any intent on part of plaintiff to sell and dispose of said land; that after the said John Meek had received the quitclaim deed to the said 4½ acres of land hereinabove described he immediately thereafter violated the provisions of the said lease entered into on the 17th day of June, 1912, and refused to comply with the terms thereof, or to pay any consideration named thereon, and in all things violated and abrogated the conditions and stipulations contained in said lease."

It is further alleged that defendant Herbert Meek has acknowledged plaintiff's right, and has surrendered that portion of the premises not conveyed by him to John Meek, but that John Meek is in possession of the 4½ acres described in the complaint, claiming it under the quitclaim deed from Herbert. The complaint prays for a decree canceling the lease and the quitclaim deed from plaintiff to John and Herbert, and directing a reconveyance of the land to plaintiff. The answer of John and Mabel Meek denies generally all charges of fraud and persuasion or solicitation on the part of John Meek in reference to the making of the lease and deed; that defendants have violated the lease; that the lease is now in effect, and the making of any provision on the part of defendants to cancel the quitclaim deed made by plaintiff to John and Herbert; and by way of separate answer it is alleged that John Meek is about 28 years of age; that for many years before his marriage he lived in the vicinity of plaintiff, worked on his father's farm and for wages, and delivered over to plaintiff his wages to aid in the support of his family, purchasing supplies for the family out of his earnings, and being in all things a dutiful son; and that on the 17th day of June plaintiff leased to him and Herbert Meek the land in contro-

versy. Then follow allegations to the effect that rely-
ing upon said quitclaim deed defendant John Meek and
his wife Mabel conveyed to Herbert Meek the 40 acres
in controversy, and thereupon Herbert Meek and H. L.
Meek, wife of G. W. Meek, to complete the agreement,
executed their deed to the 4½ acres; that relying upon
the representations of plaintiff that he made his deed
as an absolute conveyance these defendants have
erected buildings thereon, paid state and county taxes,
and made other improvements aggregating in the
whole more than $150, which but for their belief in
the truth of plaintiff's representations they would not
have done. The reply put in issue the new matter in
the answer. Upon the trial there were findings and a
decree for defendants, and plaintiff appeals.

                                        REVERSED.

For appellant there was a brief over the names of
*Messrs. Durham & Richard* and *Mr. William C. Hale,*
with oral arguments by *Mr. Durham* and *Mr. Richard.*

For respondents there was a brief over the name of
*Messrs. Colvig & Williams,* with an oral argument by
*Mr. George W. Colvig.*

MR. JUSTICE MCBRIDE delivered the opinion of the
court.

1. Plaintiff's own testimony is to the effect that,
while suffering from a severe injury, and fearing that
his family would come to want on account of his in-
ability to work, he, at the solicitation of John Meek,
executed a lease of the property in question to John
and Herbert for a period of 10 years. The subsequent
transactions are thus narrated by plaintiff:

"Well, state under what conditions you come to
make that quitclaim deed.

"A. Well, Johnnie come to me when I was to the Michigan mine and wasn't able to work yet, come to me and told me that Bill Fields and Carrie, it was— that is a son-in-law of mine, and was going to jump on to him and sue him for leasing the place for 10 years, and said they was mad at him and going to take it to court, and said Bailey told him the best thing for me to do was make a quitclaim deed, and could hold it, and he said he didn't have to have it recorded, and could whip them with the deed, and Johnnie and Herbert agreed, fair and square with me, that they would not put it on record, and would keep it only for a whip over them, and whenever the time was up, it would be burned, and there would be no blot on my record here at the County Court; that I would not have to go before any County Court to get my deed back. That was the agreement. After my other son-in-laws found out I was deeding it to Herbert and Johnnie, they come to me—Johnnie did and Herbert—and Johnnie come to me and talked it over and come to me. I was running a horse, and I walked over to Johnnie's camp with crutches, and we talked it over, and then we agreed to it, and Johnnie said he would go over and have Bailey over and acknowledge that deed; they would come over and get me with a rig and have it acknowledged.

"Q. Who was present when you had that conversation?

"A. Just Herbert and Johnnie and I; that was to be a secret between us; that was to be kept, that one, as an absolute secret. I didn't want to see them throwed out. He says, 'Papa'—he always called me —'if we go to work and clear it and make something of it, those other fellows will jump on to me'; and I says, 'I will not stand that. I would rather see you boys have it than anybody, and I will fix that deed so they can't throw you off'; and we agreed to that.

"Q. Under that agreement they were to hold it how long?

"A. For 10 years, until the lease run out, and then we was to burn the deed and destroy it, and nothing

to be done with it and if they wasn't forced to they would not let anybody see it except the man I acknowledged it before, W. S. Bailey.

"Q. State whether or not, when Johnnie first made a proposition to you to execute a quitclaim deed, you agreed to it.

"A. Why, I, told him I didn't think that was necessary, and he said he thought it was; that they would put him to a lot of bother. That is the only way he could see, and he would not like to take hold of it, and they would see that I and the family would not want for anything, and I didn't think at the time I would ever be able to work and they said: 'We will look after the family and see you have as good as we have got, and pay all of the taxes and ditch assessments and telephone assessments. We will take the place and run it and give you one third for it'; and we wasn't very particular about it, for the simple reason it was two sons, and the only two sons, I had out of ten children, and I didn't think they would do me any dirt, I had all the confidence in the world with the boys. * *

"Q. At the time you made that deed that has just been offered in evidence, what was your physical condition?

"A. It was bad.

"Q. You say, you were unable to work at that time?

"A. I was unable to do a day's work at that time, I could do a little work, but very little. I tried to work, and had to give it up. * *

"Q. You knew perfectly what you were doing when you signed that deed?

"A. Why, yes.

"Q. Your mind was all right?

"A. My mind was all right. * *

"(By the Court:) Q. Mr. Meek, I noticed in your complaint that you alleged this deed was given at the time when John came to you and represented to you that he was afraid you would get in debt and involved so that it would jeopardize the boys' interest.

"A. I was already in debt at the time, doctor bills and store bills, when I got hurt.

"Q. I understand; but, as I understand your testimony to-day, John came to you and represented to you that he was afraid the Fields would—

"A. Well, Johnnie did; he came to me and told me that he was afraid Fields would jump on to them, not on to me, but on to them, about the lease.

"Q. But your complaint alleges Johnnie came to you and said he was afraid you would get in debt.

"A. Well, that is just what Johnnie told me.

"Q. Well, which did he tell you that Fields would go for them?

"A. He told me both; he said 'If you don't do that, they will jump on to us and throw us out of court.' "

Herbert Meek testified, in substance:

"After we signed the lease John wanted a quitclaim deed. As near as I can remember he (John) told my father that we would take care of the family then and see that they did not want for anything, and sign the land back to him at the end of 10 years, and that we would not put it on record, no deed on record or nothing. * * He said he wanted it for protection. He said Bill Fields was going to jump on us and throw us out of the lease, and if we had a deed it would protect us in it. * * The deed was to stand for 10 years; provided we kept our lease up."

Mrs. Hanna L. Meek, wife of plaintiff, testified that after the quitclaim deed was made John said in her hearing that they were to hand it back at the end of 10 years; that the deed was out at the end of 10 years. J. L. York, who is the only witness for plaintiff who is not in any way related to the parties, testifies upon this branch of the case as follows:

"Q. Did you have any conversation with him [referring to John]?

"A. About the land?

"Q. About the lots and the land.

"A. Yes; he was telling me.

"Q. Now state just what he told you.

"A. Well, he told me that, he says, 'I heard we got a quitclaim deed to this piece of ground.' 'Now,' he says, 'don't you think that is better still?' I says, 'Did George deed it to you?' and he said, 'Yes.' 'Well,' I says, 'then you fellows got a pretty good thing if you have got a thousand dollars a piece anyhow.' 'No,' he says, 'we can't sell at the end of 10 years'; he says, 'we can't sell it at the end of 10 years; we agreed to give it back'; he said, 'I and Herbert both.' 'Well,' he says, 'the way I look at it, we will clear the bottom up over there, and get some cows and put on over there, and the way I look at it, I can get enough out of it to buy me a damned nice little place anyhow'; he says, 'Papa is all broke down, and Mamma is sick, and before the end of that time we will be all right, and if we ain't, we can make different arrangements then.' "

This part of the conversation is not denied by John in his testimony. He denied that he solicited his father to make the lease, but claimed that it was made upon his father's suggestion. He further denied that he solicited his father to make the quitclaim deed, that he ever told him that Fields was likely to make trouble, or that he wanted the deed for protection. His testimony flatly contradicts that of his father and Herbert in every material particular. As to the immediate circumstances attending the execution of the deed, his testimony is as follows:

"Q. State the circumstances under which the quitclaim deed for the 40 acres was made from your father to you and Herbert; that is, how it came up that he deeded it to you.

"A. Well, he asked—he told Herbert and me that my—I don't know whether he told my brother or not that he thought he would deed this 40 acres to us, that he was getting tired of working at home, and he said he could make more taking pictures, and said he was going away, and said he might come back once in a while and visit, and that is about all, he thought.

"Q. Well, did he, at that time, say anything about the effect the deed would have on the lease, the deed he afterward—

"A. Why, I told him at the time when talking about deeding, and I didn't see any use of doing that; let it go as it is; and he said he did not think it was worth while monkeying with that any more; he said if he ever did want to farm again, he would have the homestead there, and after he got well enough he might work on that."

He testified that previous to his marriage all his earnings, except what was necessary to support himself, had been expended for the support of his father's family. He made the statement that in 1904 his father collected $40 of his wages and kept it. His employer testified that he paid this sum to plaintiff. Plaintiff explains this by saying that he and John were both working for the same employer, and that when he came to pay them for their labor, he took this $40 for John, who was away from home, and gave it to him when he returned. There is no other testimony indicating that John ever did anything toward the support of the family beyond what any son or brother would have been in duty bound to do under like circumstances. Mabel Meek, the wife of John, testified that shortly before the deed was executed plaintiff said to her, in substance:

"I am going to deed my part of that 40 acres of land to the boys, get out of it, and go away and take pictures. I can make more out of it and be better satisfied."

This statement is denied by plaintiff, who says he made a statement similar to that in regard to making the lease, which was executed at the camp where she was staying. Ella Meek, daughter of plaintiff, who is living with her brother John and seems to be on bad terms with her father, testified that in June, 1912, her

father told her that he was going to deed his part of the land to the boys, that they had earned it and needed it, and that when he came back to camp after making the deed, he said:

"Well, I have got it all in my hands. I am clear now. I will not have nothing to bother. I can go where I please."

This alleged statement is denied by plaintiff, who testifies that when he made the lease he said to his daughter:

"The folks at home will have something to live on anyway. The folks will not suffer, and maybe I can make a living anyway."

He also testified as to the unfriendliness of his daughter, owing to objections made by him to her conduct, which he thought might have an unfavorable influence upon the other children. W. S. Bailey, the notary who prepared the lease and deed, testified that plaintiff and his two sons came together to have the deed drawn up, and that when it was read to the parties, he called their attention to the fact that the deed would do away with the interests under the lease, and that plaintiff remarked that it was all right; that the old woman, meaning his wife, would hold her interest, or words to that effect. Plaintiff and Herbert deny that this conversation took place, while John and his wife corroborate Bailey.

We have given practically all the testimony bearing upon the intention of plaintiff in executing the deed. It comes chiefly from members of the family, few of whom seem to be entirely fair and reliable. That they are ignorant and prejudiced, and for the most part inclined to overstate facts in their favor and to deny anything which they think may militate against their respective contentions, is plain; but, taking all the

circumstances together, we are disposed to accept the
statement of plaintiff as being essentially correct. The
40 acres of land described in the deed was the only
land which he actually owned. It is true that he had
located a homestead adjoining to which he had not yet
obtained title, but it is hardly probable that he would
absolutely convey away the only land owned by him,
and leave his wife and younger children dependent upon
the bounty of his two sons, without some assurance
from them that they would be protected. The mother
of the boys seems to be a fair, straightforward witness,
and her testimony supports the contention of her hus-
band. York is not connected with the family, and
there is nothing to indicate that he has any reason to
color his testimony in favor of plaintiff, and unless he
has committed deliberate perjury, John stated to him
that the deed was to become ineffective at the end of
10 years. While Herbert's conduct in some respects
is not to be commended, it was plainly to his interest to
have held on to the property and to have corroborated
his brother if, in fact, the agreement was not as his
father states it. That he has acted and testified
against his interest tells strongly in favor of the truth-
fulness of his testimony. The only other apparently
disinterested witness is Bailey, and, conceding every-
thing testified by him to be true, it is not inconsistent
with the facts that such an agreement as plaintiff
claims to have been made actually was made. If the
agreement and intention of the parties were that the
real intent of the deed should be kept secret, it is not
surprising that plaintiff should have failed to explain
that intent when told that the deed would render the
lease nugatory. As a matter of law, it would have
that effect, but plaintiff was not dealing with his sons
with reference to the strict legal effect of the transac-

tion, but confidentially and with reference to their relationship to him.

Upon the whole testimony we are satisfied that John deliberately planned the scheme to get a deed for the property instead of a lease, for the purpose of overreaching and defrauding his father out of the title to the property, and this the law will not permit where the parties stand in a confidential relation to each other, as in this case: *Jenkins* v. *Jenkins,* 66 Or. 12 (132 Pac. 542); *Brison* v. *Brison,* 75 Cal. 525 (17 Pac. 689, 7 Am. St. Rep. 189). These cases state the law as we view it.

2. Nor would defendant John Meek be in any better position if he had taken the property, originally intending to keep his promise and later formed and acted upon an intention to break it and hold the title. In a case where confidential relations, such as husband and wife, parent and child, exist, the betrayal of such a confidence itself raises a constructive trust. The case last cited arose where a wife persuaded her sick husband to make her a deed to his property upon her promise to reconvey to him if he should recover and request it. He recovered, but she did not reconvey. The court says:

"The relation of the parties to each other, therefore, was confidential in fact as well as in law. The plaintiff was induced to make the deed by the confidence which he had in his wife, and the belief thereby engendered that she would perform her promise. But for that he would not have made it. The betrayal of such confidence is constructively fraudulent, and gives rise to a constructive trust. This is independent of any element of actual fraud: 1 Story, Eq. Jur., §§ 258, 307. The law, from considerations of public policy, presumes such transactions to have been induced by undue influence: Civ. Code, § 2235; Bigelow, Fraud (ed. 1888), pp. 261, 262; Kerr, Fraud and Mistake,

(Bump's Am. ed.), p. 151; Hovenden, Fraud, p. 18.   The
extent and variety of the application of this principle
to persons in confidential relations with each other may
be seen from the notes to the leading case of *Huguenin*
v. *Basely,* 2 Lead. Cas. Eq., pt. 2, p. 1156.   From the
cases there cited, it will abundantly appear that while
it is not impossible that a gift between persons in such
relations may be valid, yet that all such transactions
are constructively fraudulent, and are only to be up-
held upon a showing of special circumstances: See,
also, *Hatch* v. *Hatch,* 9 Ves. 296.   Now, if this be so—
if the law does not permit such transactions to stand
even where there was an intention that the donee
should have the property—how much more should it
interpose where, as here, there was no such intention,
but only an intention that she should retain the sem-
blance of ownership for a time.   We think the authori-
ties fully bear out the assertion that in such cases a
constructive trust arises, and that the statute of frauds
has no application.''

We believe this to be the law notwithstanding a *dic-
tum* in *Parrish* v. *Parrish,* 33 Or. 486 (54 Pac. 352),
which intimates a contrary opinion.   In any case there
is evidence from which an original design on the part
of John to entrap and defraud his father may fairly be
inferred.

3. It is claimed that there is a variance between the
pleadings and the proof as to the false representations
made by John to his father.   The complaint alleged, as
will be observed from the statement, that John repre-
sented that he was afraid plaintiff would become in-
volved in debt by reason of his physical condition, and
requested that a deed be given to protect his mother
and himself for that reason; whereas the testimony of
plaintiff indicated that the principal reason assigned
was a fear that relatives would attack the lease.   In
answer to a question by the court, the plaintiff an-
swered that John made both statements, but we do not

consider the variance material. The fraud is not predicated upon John's making a false statement, but in procuring the deed by any statement true or false, with the intent to use it for the purpose of defrauding his father. It is evident that defendant was not in any way misled by the alleged variance, nor deprived of any defense which he might have made had the pleadings been different; and, this being so, the alleged variance is immaterial: *Moore* v. *Frazer*, 15 Or. 635 (16 Pac. 869).

The decree will be reversed, and one entered here in accordance with the prayer of the complaint; but, as the defendant has apparently made some improvements of a permanent nature, neither party will recover costs here or in the court below.    REVERSED.

MR. CHIEF JUSTICE MOORE, MR. JUSTICE BENSON and MR. JUSTICE BURNETT concur.