Argued and submitted June 4, certified question answered October 10, 2019

John WADSWORTH,
individually and as trustee for
the RBT Victim Recovery Trust,
*Plaintiffs,*

*v.*

Ronald B. TALMAGE
and Annette C. Talmage,
in Default as of 8/31/2017;
Rivercliff Farm, Inc., an Oregon corporation,
in Default as of 1/26/2017; and
New Century Properties Ltd.,
in Default as of 8/31/2017,
*Defendants below,*

*and*

UNITED STATES OF AMERICA,
*Defendant.*

(United States Court of Appeals
for the Ninth Circuit - 17-35805)
(SC S066414)

450 P3d 486

The Ninth Circuit certified a question to the Oregon Supreme Court: Does a constructive trust arise at the moment of purchase of a property using fraudulently-obtained funds, or does it arise when a court order that a constructive trust be imposed as a remedy? *Held*: (1) A constructive trust arises when a court imposes it as a remedy, but the party for whose benefit the constructive trust is imposed has an equitable ownership interest in the property that predates the constructive trust; (2) plaintiffs have a viable subrogation theory that allows them to seek a constructive trust based on equitable interests that predate all tax liens on the property at issue in this case.

The certified question is answered.

En Banc

On certified question from the United States Court of Appeals for the Ninth Circuit; certification order dated January 2, 2019; certification accepted January 31, 2019.

William B. Ingram, Strong & Hanni, Salt Lake City, Utah, argued the cause and filed the briefs for plaintiffs on

review. Also on the briefs were Thomas A. Ped, Williams Kastner Greene & Markley, Portland.

Randolph L. Hutter, U.S. Department of Justice, Washington, D.C, argued the cause and filed the brief for defendant on review. Also on the brief was Jeremy N. Hendon, Washington D.C.

BALMER, J.

The certified question is answered.

**BALMER, J.**

This case is before the court on a certified question from the United States Court of Appeals for the Ninth Circuit, under ORS 28.200. The Ninth Circuit certified to the court the following question:

> "Under Oregon law, does a constructive trust arise at the moment of purchase of a property using fraudulently-obtained funds, or does it arise when a court orders that a constructive trust be imposed as a remedy?"

*Wadsworth v. Talmage*, 911 F3d 994, 999 (9th Cir 2018). We accepted that question, reformulating it to include one related issue:

> "If the former, does it make any difference if the fraud as to the party seeking establishment of a trust occurred after the initial purchase?"

As we discuss in greater depth below, we answer the first part of the question by clarifying that a constructive trust arises when a court imposes it as a remedy, but that the party for whose benefit the constructive trust is imposed has an equitable ownership interest in specific property that predates the imposition of the constructive trust. We also answer the second part of the question by explaining that, in the circumstances of this case, plaintiffs have a viable subrogation theory that allows them to seek a constructive trust based on equitable interests that predate all tax liens on the property.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

We begin by setting out the underlying facts, which we take from the Ninth Circuit's certification order and, in light of the procedural posture of the case, the complaint. *See Wadsworth*, 911 F3d at 995 ("Because this case was resolved in federal district court on a motion to dismiss, the factual background is based on the allegations in the complaint, which we assume to be true.").

Beginning in the 1990s, defendant Ronald Talmage ran a Ponzi scheme. More specifically, he represented to client investors, in the United States and Japan, that he would hold their funds in trust and invest them. Instead, he

made no investments on behalf of clients and repaid clients only through use of the funds of later clients. Talmage also induced investments through false claims about his fund's size and history. In 1997, Talmage and his wife acquired the RiverCliff Property ("RiverCliff") for $903,000, and paid that price exclusively using money that Talmage was holding for his clients. Between 1998 and 2006, Talmage took more than $12.5 million of client funds to make improvements to the property.

Plaintiffs are victims of the scheme;[1] they first invested funds with Talmage in 2002. Much of the money that they invested with Talmage was used in the improvements to RiverCliff. In 2005, another $1.5 million of plaintiffs' funds was used to pay Talmage's wife for her half interest in RiverCliff, after the couple divorced. And $3.4 million of plaintiffs' funds was used to repay earlier, pre-2002 investor clients, including clients whose funds had been used to purchase RiverCliff. In June 2005, Talmage transferred RiverCliff, without consideration, to a corporate entity that he controlled and that is also a defendant in the federal action.

Meanwhile, Talmage had failed to pay federal income taxes from 1998 to 2005, and in 2007. The Internal Revenue Service (IRS) recorded tax liens, beginning in 2008, under 26 USC § 6321. That history sets the stage for the present dispute, which is between plaintiffs and the federal government.

The government brought an action to foreclose its tax liens on RiverCliff. Plaintiffs

"then brought the present action to quiet title to RiverCliff as to the Government. The Trust's complaint contends that because Talmage 'used wholly stolen funds' to obtain and improve RiverCliff, 'he did not hold an enforceable or legitimate property interest' in the property. The Trust contends that the Government's federal tax liens therefore could not attach to RiverCliff under 26 USC § 6321, which authorizes liens on 'all property and rights to property *** belonging

---

[1] Specifically, plaintiff Wadsworth was a victim of the scheme, and a number of victims, including Wadsworth, assigned their interests to plaintiff RBT Victim Recovery Trust.

to' a person who owes 'back taxes.' The Trust contends that it has either an exclusive or superior interest in RiverCliff under Oregon law as a resulting trust, as a constructive trust, or based on other equitable relief."

*Wadsworth*, 911 F3d at 996. The government moved to dismiss, arguing that RiverCliff

"'belonged' to Talmage within the meaning of 26 USC § 6321, and that a federal tax lien could attach. It argued that the Trust had, 'at most,' a claim that did not become choate until after the federal tax liens had attached. The Government argued its tax liens were therefore superior to any claims the Trust might have."

*Id.* The trial court agreed with the government and dismissed plaintiffs' quiet title claim.

Plaintiffs appealed to the Ninth Circuit, which explained that the dispute turned on "Oregon state law regarding constructive trusts" and that,

"[t]o determine whether property 'belongs' to someone within the meaning of § 6321, a federal court must, first, 'look *** to state law to determine what rights the taxpayer has in the property the Government seeks to reach,' and then, second, 'determine whether the taxpayer's state-delineated rights qualify as "property" or "right to property" within the compass of' 26 USC § 6321."

*Wadsworth*, 911 F3d at 997 (quoting *Drye v. United States*, 528 US 49, 58, 120 S Ct 474, 145 L Ed 2d 466 (1999)). Having so framed the inquiry, the Ninth Circuit explained that, "[i]n the case before us, the Trust can prevail in its quiet title action only if, under Oregon law, a constructive trust arises at the moment of the purchase of a property with ill-gotten gains, such that the purchaser never acquires rights in the property beyond bare legal title." *Wadsworth*, 911 F3d at 998. That court then observed that the descriptions of constructive trusts in our case law have not been entirely consistent and certified to us the question of when a constructive trust arises.

In their briefs, plaintiffs and the government cite numerous cases that this court has decided. Plaintiffs highlight cases that refer to a constructive trust arising at some

time prior to a court's judgment, which they characterize as consistent with the "majority rule." The government cites a number of cases that refer to constructive trusts as purely remedial mechanisms, or where courts are said to "impress" or to "impose" a constructive trust.

The parties also offer theoretical reasoning in support of their positions. The government contends that, in light of our holdings in *Barnes v. Eastern & Western Lbr. Co.*, 205 Or 553, 594, 287 P2d 929 (1955), and *Tupper v. Roan*, 349 Or 211, 219, 243 P3d 50 (2010), a constructive trust is a form of remedy, and, like other remedies, must arise only when imposed by a court. Any retroactive existence, says the government, is therefore purely fictional, the product of the doctrine that constructive trusts relate back to an earlier unjust enrichment. Plaintiffs cite several treatises and argue that taking the government's position would entail a rejection of the majority view of constructive trusts.

We find neither party's arguments fully persuasive. As we explain, the question that they are fighting over appears to be less consequential than they take it to be, and we do not see any fundamental conflict in our case law. Nevertheless, we agree with the government that, because a constructive trust is a form of remedy, rather than a type of trust, constructive trusts originate at the time that they are imposed by the court. We also agree with plaintiffs, however, that a remedial constructive trust is based on a preexisting equitable ownership interest and that an understanding of the nature of that interest may prove helpful to the Ninth Circuit in resolving the issue before it. We therefore discuss briefly the nature of the equitable interest that forms the basis for the imposition of a constructive trust under Oregon common law.

## II.   WHEN CONSTRUCTIVE TRUSTS BEGIN

### A.   *The Scope of the Question*

The parties, and the Ninth Circuit, highlight an inconsistency in our cases as to when a constructive trust arises. We cannot resolve that inconsistency for purposes of answering the certified question without first clarifying its relevance to that question, and we begin there.

A constructive trust is a form of remedy for unjust enrichment. *Tupper*, 349 Or at 219. The remedy has its limits, as "a constructive trust can attach only to items and money that the evidence clearly identifies as rightfully 'belonging' to the plaintiff, or to the identifiable products of, or substitutes for, those items and money." *Id.* at 222. But it also has its advantages, and one reason that a plaintiff may elect a constructive trust as a remedy is "'for the sake of priority against the defendant's general creditors.'" *Evergreen West Business Center, LLC v. Emmert*, 354 Or 790, 801, 323 P3d 250 (2014) (quoting *Restatement (Third) of Restitution and Unjust Enrichment* § 4 comment e (2001)); *see also Restatement (Third)* § 60 ("Except as otherwise provided by statute and by § 61, a right to restitution from identifiable property is superior to the competing rights of a creditor of the recipient who is not a bona fide purchaser or payee of the property in question.").

Here, plaintiffs seek a constructive trust to obtain priority over the federal government's tax liens. But, somewhat counterintuitively, the case before us is not a fight over the priority rules that govern constructive trusts. The parties agree that a plaintiff entitled to a constructive trust would receive priority over ordinary creditors under state law and that whichever answer we give to the question of when the constructive trust originates will not make the slightest difference to the application of those rules. That is because, the government acknowledges, a constructive trust may "relate back" to an earlier date, even if it arises only when it is declared by a court. The parties also agree that federal law allows tax liens to jump the ordinary priority queue, as long as the property to which the lien attaches "belonged" to the taxpayer at that time. Here, then, the question of when a constructive trust arose is not pertinent to priority directly, but rather to whom RiverCliff—in the words of the federal statute, 26 USC § 6321—"belong[ed]" when the government obtained its tax liens. That question, the parties submit, hinges on when a constructive trust arose.

As the foregoing illustrates, the question before us has significance only to the application of federal law, and only as it bears, if it does, on whether RiverCliff "belong[ed]"

to the taxpayer when the actions giving rise to the constructive trust arose. Many of the cases cited by the government on the question of when a constructive trust originates are federal cases, dealing with other interactions between federal law and state constructive trusts. *See, e.g.*, *Healy v. Commissioner*, 345 US 278, 282-83 (1953); *Blachy v. Butcher*, 221 F3d 896, 905 (6th Cir 2000); *International Refugee Org. v. Maryland Drydock Co.*, 179 F2d 284, 287 (4th Cir 1950). Not only is there no Oregon case that lends the question of when a constructive trust begins any significance, the parties have been unable to identify any other state case in which a substantive issue turned on the resolution of that question.

That observation leads to one potential concern, in this instance pertinent to our acceptance of this question: whether the question that we have been asked to answer is actually one of state law at all. *See Western Helicopter Services v. Rogerson Aircraft*, 311 Or 361, 365, 811 P2d 627 (1991) (explaining that we can accept certification only if the question is one of Oregon law). The Eleventh Circuit, at least, has suggested that an analogous question in the forfeiture context is really one of federal law. *United States v. Ramunno*, 599 F3d 1269, 1274 n 2 (11th Cir 2010) (distinguishing a prior case concerning the time that a constructive trust came into being on the ground that it "was considering the federal law temporal question, not the threshold state law question of whether a constructive trust exists"). Because the question's practical consequences are limited to interactions with federal statutes, it might be contended that the question is, at heart, one of federal law. Indeed, the government attempts to rely on *Healy*, 345 US at 282-83, in which the United States Supreme Court treated the effect of state constructive trusts on tax obligations as a question of federal law and, in that context, discussed the time at which they originated without any reference to state law.

Nevertheless, we are persuaded that it remains appropriate for us to answer the question certified by the Ninth Circuit. There is, at bottom, a state law answer to that question, even if the law of our state may not completely resolve the federal question at issue in this case. At the end of the day, and strictly as a matter of state law, it must

either be the case that a constructive trust exists from the moment of the fraudulent transaction or that it is created by the court at some later date. The distinction might be one that, apart from its federal law consequences, is essentially academic, but academic questions still have answers.[2]

Plaintiffs argue that, given the relative insignificance of the question for any purpose other than the federal statute at hand, the equitable purposes of a constructive trust would be better served if we were to decide that a constructive trust originates at the time of the fraudulent conduct. Put another way, if accepting plaintiffs' theory of a constructive trust's origins is necessary for federal courts to respect the priority that state law accords to constructive trusts—and there are no other real stakes to this case—then why not accept it for that reason alone?[3]

We view that as an inappropriate consideration in our decision. To the extent that federal law deviates from Oregon's priority rules, that is Congress's decision to make, just as our own legislature ordinarily has the authority to modify our state's rules of equity by statute. *See Evans Products v. Jorgensen*, 245 Or 362, 372, 421 P2d 978 (1966) (declining to apply unjust enrichment principles in a case subject to Article 9 of the Uniform Commercial Code (UCC), because "[t]he purpose and effectiveness of the UCC would be substantially impaired if interests created in compliance with UCC procedures could be defeated by application of the equitable doctrine of unjust enrichment"). Our role in this case is to elucidate the structure of constructive trusts under Oregon common law, not to gerrymander our terms so as to yield a particular result under federal law.

---

[2] "[T]he decisional effect of our answer" is one factor to weigh when deciding whether to answer a certified question. *Western Helicopter Services*, 311 Or at 369. For the reasons just given, this may not be a significant decision for state law purposes. However, the Ninth Circuit, at least, has indicated that the application of the federal statute at issue turns on the law of this state, and the answer to this question may be significant in other federal contexts as well. *See United States v. Wilson*, 659 F3d 947, 954-55 (9th Cir 2011) (looking to state law on when a constructive trust begins in the forfeiture context).

[3] The government, for its part, suggests that, because the priority accorded to constructive trusts is inequitable to the extent that it deprives the government's tax liens of validity, this court should adopt the government's theory of constructive trusts in order to avoid that result.

B.  *The Development of the Constructive Trust in Oregon*

We turn to our cases on constructive trusts. As we discuss, those cases evince a transformation over time from a view of the constructive trust as a species of trust to a view of the constructive trust as a remedy for unjust enrichment—a transformation that is in line with the development of American law generally. That shift explains, in part, the different usages of the term "constructive trust" that the parties have found in our cases.

Our earliest cases on constructive trusts classed them as a species of trust. Trusts were divided into "express" and "implied," and the category of implied trusts was subdivided into resulting trusts and constructive trusts. *See Manaudas v. Mann*, 22 Or 525, 530, 30 P 422 (1892) (citing John N. Pomeroy, 2 *A Treatise on Equity Jurisprudence* § 987, 533-34 (1st ed 1886)); *Springer v. Young*, 14 Or 280, 282-83, 12 P 400 (1886).

In one of our earliest substantial discussions of constructive trusts, we appeared to take a position on the time that a constructive trust emerged. In *Barger v. Barger*, 30 Or 268, 269, 47 P 702 (1897), the plaintiff and her husband had received a parcel of land through the Donation Land Act, of which plaintiff originally owned half.[4] The couple sold their claim, and, using that money, the husband purchased an interest in a ferry. *Id.* at 270. That, too, was sold, and the husband used some of the funds to purchase 115 head of cattle. *Id.* 270. Some years later, the cattle business was sold, and the proceeds were used to cover most of the purchase of two tracts of land. *Id.* at 271. The husband died, some portion of the land passed to the couple's children, and the plaintiff sought to have recognized an implied trust over

---

[4] The Donation Land Act provided grants of land to Oregon settlers and conveyed to a married man "the quantity of one section, or six hundred and forty acres, one half to himself and the other half to his wife, *to be held by her in her own right* * * *." Act of Sept 27, 1850, 9 Stat 496, 497 (emphasis added). Early on, we held that the Donation Land Act, at least in combination with a subsequent act of the territorial legislature, gave the wife title to her half of the granted land, and that she could not be divested of it by her husband against her will. *Linnville v. Smith*, 6 Or 202, 204 (1876). In two cases prior to *Barger*—*Linnville* and *Springer*—this court had used trust theories to protect a married woman's interest in proceeds from land that she had received through the Donation Land Act.

the land, arguing that she had owned half of the Donation Land Act claim, the proceeds of which were ultimately used to purchase the land in dispute. *Id.* at 269, 273-74. With respect to both constructive and resulting trusts, the court explained that

> "a trust of either description must arise, if at all, *at the time of the conveyance*, and the money or other consideration for the deed which is the foundation of the trust must then be paid, or secured to be paid."

*Id.* at 276 (emphasis added). This court linked that principle to the concept of tracing, which was at the heart of the case:

> "The fund, or other form of property which it is sought to trace into a different form, does not lose its identity, while it may change in semblance, as, if a sum of money is expended for a parcel of land, or a band of cattle exchanged for stock in a bank, the property form is changed, but the identity of the original form is traceable and distinguishable. \*\*\* That which was the property of the *cestui que trust* in the first instance continues to be his property, in equity, throughout all its metamorphoses, but when the identity is lost the trust escapes. \*\*\* It is therefore the entire ownership, speaking in an equitable sense, that must be established, and not some equitable lien upon the changed form of property; and, if established, the *cestui que trust* takes the property thus identified, not that his demand be satisfied out of it."

*Id.* at 276-77. This court ultimately determined that the plaintiff's funds that were derived from the original land had become too intermingled with other funds over the course of the relevant transactions to be traceable, and that, based on her consent, certain transactions "must be regarded as a loan, rather than the imposition of trust obligations upon [her husband]." *Id.* at 279.

*Barger* thus clarified two fundamental principles of constructive trusts. First, for a constructive trust to be established there must be a traceable equitable ownership interest in specific property—one that existed at the time of conveyance. Second, in light of that principle, *Barger* declared that constructive trusts, like resulting trusts, originate at the time of the conveyance.

Despite that clear statement in *Barger*, however, this court on several occasions described the origins of constructive trusts differently. The next year, in *Parrish v. Parrish*, 33 Or 486, 54 P 352 (1898), *overruled on other grounds by Hanscom v. Irwin*, 186 Or 541, 208 P2d 330 (1949), this court stated that "'the interference of courts of equity is called into play by fraud as a distinct head of jurisdiction, and the complainant's right of relief is based upon that ground; the defendant being treated as a trustee merely for the purpose of working out the equity of the complainant.'" *Id.* at 492 (quoting George T. Bispham, *The Principles of Equity* § 91, 133 (4th ed 1887)). That statement expressed a different view of constructive trusts—that is, as a fiction employed after-the-fact by the court, rather than a type of trust.

Inconsistency in how constructive trusts were conceptualized predominated during this period. In *Kroll v. Coach*, 45 Or 459, 473, 78 P 397 (1904), this court quoted the same passage from Bispham's treatise, and, in *Clough v. Dawson*, 69 Or 52, 60-61, 138 P 233 (1914), the court held that "[t]he Circuit Court properly impressed a constructive trust" on certain property, each of which could suggest that a constructive trust originated only after the intervention of a court. Yet those cases were followed by an emphatic statement to the contrary:

> "If a resulting or a constructive trust arose at all, it must have been at the time of the conveyance; for these are obligations imposed by the law itself in spite of or independent of the actions of the parties themselves. The law is constantly operant, and without delay attaches the consequences to be derived from the acts of the parties. So far as such trusts are concerned, they are not created or established by subsequent acts of any of the participants."

*Chance v. Graham*, 76 Or 199, 208-09, 148 P 63 (1915). And, inconsistent with the earlier assertion that a court impresses a constructive trust, this court stated in *Meek v. Meek*, 79 Or 579, 591, 156 P 250 (1916), that, "[i]n a case where confidential relations, such as husband and wife, parent and child, exist, the betrayal of such a confidence itself raises a constructive trust."

That confusion was understandable, because this court was hardly the only court struggling to develop a conceptually satisfying theory of constructive trusts. *See* Warren A. Seavey & Austin W. Scott, *Restitution*, 54 LQ Rev 29, 40 (1938) (observing that, prior to the *Restatement (First) of Restitution*, there was "no general agreement among the treatise writers as to what constitutes a constructive trust, and the definitions and descriptions given are widely divergent"). In fact, a rather important doctrinal shift was about to occur on a national level. The shift likely began with a 1920 law review article by Roscoe Pound, then Dean of Harvard Law School. *See* Lionel Smith, *Legal Epistemology in the Restatement (Third) of Restitution and Unjust Enrichment*, 92 BU L Rev 899, 908 (2012) (describing origins of the shift). Pound expressed the key innovation simply: "An express trust is a substantive institution. Constructive trust, on the other hand, is purely a remedial institution." Roscoe Pound, *The Progress of the Law, 1918-1919 Equity*, 33 Harv L Rev 420, 420-21 (1920). Pound went on to suggest that, "[i]f one bears in mind the purely remedial nature of constructive trust, the results which courts have reached in [cases involving constructive trusts] are attained with much less difficulty." *Id.* at 422.

That view proved influential. Although constructive trusts were initially slated to be included in the American Law Institute's *Restatement (First) of Trusts*, the decision ultimately was made to move constructive trusts, as well as quasi-contractual obligations, into a restatement of their own, the *Restatement (First) of Restitution*. *See Restatement (First) of Trusts*, Introduction at xi (1935) (explaining that constructive trusts had not been included); Andrew Kull, *Three Restatements of Restitution*, 68 Wash & Lee L Rev 867 (2011) (describing that history). The first *Restatement* strongly embraced the remedial view of constructive trusts:

> "The term 'constructive trust' is not altogether a felicitous one. It might be thought to suggest the idea that it is a fiduciary relation similar to an express trust, whereas it is in fact something quite different from an express trust. An express trust and a constructive trust are not divisions of the same fundamental concept. They are not species of

the same genus. They are distinct concepts. A constructive trust does not, like an express trust, arise because of a manifestation of an intention to create it, but it is imposed as a remedy to prevent unjust enrichment. A constructive trust, unlike an express trust, is not a fiduciary relation, although the circumstances which give rise to a constructive trust may or may not involve a fiduciary relation.

"It is true that both in the case of an express trust and in that of a constructive trust one person holds the title to property subject to an equitable duty to hold the property for or to convey it to another, and the latter has in each case some kind of an equitable interest in the property. In other respects, however, there is little resemblance between the two relationships. An attempt to define a trust in such a way as to include constructive trusts as well as express trusts is futile, since a single definition which would include such distinct ideas would be so general as to be useless."

*Restatement (First) of Restitution* § 160 comment a (1937). The constructive trust was linked to the animating principle of the *Restatement*—unjust enrichment. The *Restatement* explained that "[a] constructive trust is imposed upon a person in order to prevent his unjust enrichment." *Restatement (First) of Restitution* § 160 comment c. That, it should be noted, was a substantial innovation, and a distinctly American one. *See* D. W. M. Waters, *The Constructive Trust in Evolution: Substantive and Remedial*, 10 Est & Tr J 334 (1991) (contrasting development of American law of constructive trusts with that of Commonwealth countries).

However, despite that innovation, the *Restatement* effectively took the position that the constructive trust arose at the time of the transaction giving rise to the unjust enrichment, not when instituted by the court. For example, in explaining the bona fide purchaser rule—the principle that property in the hands of a bona fide purchaser cannot be recovered through a constructive trust, see *Tupper*, 349 Or at 223—the *Restatement* explained:

"This principle is most frequently applied to the situation where a person holds property subject to a constructive trust and transfers it to a person who pays value without notice of the facts which gave rise to the constructive trust; in which case the constructive trust is cut off."

*Restatement (First) of Restitution* § 172 comment a. In that context, the *Restatement* used "constructive trust" to refer to an interest that predated the court's order and, indeed, could be terminated prior to the case coming before a court. Similarly, when discussing the effect of the availability of alternative remedies, the *Restatement* asserted that

> "a constructive trust may exist even though[,] because of the adequacy of the remedy at law[,] a proceeding in equity cannot be maintained specifically to enforce it; but a constructive trust will not be imposed merely because[,] owing to the insolvency of the defendant[,] the remedy at law is inadequate."

*Restatement (First) of Restitution* § 160 comment f. Thus, in the terminology of the *Restatement*, a constructive trust exists in the discussed circumstances all the while but may (or may not) be enforced by the court.

Two decades later, in *Barnes*, 205 Or at 594-97, this court came to adopt the remedial view of constructive trusts set forth in the *Restatement (First) of Restitution*. In that case, we explained that

> "a constructive trust is simply a procedural device. A constructive trust does not create in the party favored by it any new substantive rights. Its sole purpose is to enable the courts to afford the victim of the wrong relief in specie. In instances in which the law employs a constructive trust, the doctrine of unjust enrichment governs generally the substantive rights of the parties."

*Id.* at 596-97. We also emphasized what a constructive trust was *not* intended to accomplish:

> "The purpose of creating the procedural device known as a constructive trust was not to effect a change in the substantive law and place the trustee of a constructive trust upon the same level as that of a trustee of an express trust."

*Id.* at 602. That phrasing, as well as the remedial tenor of the case, could suggest that a constructive trust is something created by a court, but as in the *Restatement*, other lines in *Barnes* suggested otherwise: "If the defendants' fraud made them constructive trustees when they acquired the Buehner stock, no rescission was necessary and no court action was needed to bring about that result." *Id.* at 593.

Our usage of the term "constructive trust" since *Barnes* has not been entirely consistent, either. In several cases, we have referred to a court "impressing" property with a constructive trust. *See Montgomery v. U.S. Nat'l Bank et al*, 220 Or 553, 570, 349 P2d 464 (1960) (using that wording); *Schomp et al v. Brown et al*, 215 Or 714, 716, 335 P2d 847, *decision clarified on denial of reh'g*, 215 Or 723, 337 P2d 358 (1959) (same). And in several more cases, we have made references to courts "imposing" constructive trusts or the "imposition" of a constructive trust by a court. *Stirewalt v. Chilcott*, 236 Or 128, 136, 387 P2d 351 (1963); *Jimenez v. Lee*, 274 Or 457, 462, 547 P2d 126 (1976); *Osterberg v. Osterberg*, 278 Or 277, 279, 563 P2d 696 (1977); *Tupper*, 349 Or at 223. However, in a handful of cases, we have continued to refer to constructive trusts in ways that are more consistent with a constructive trust emerging at the time of an unjust enrichment. We have stated that, in certain situations, a trust "arose by operation of law" based on a given set of facts. *Person v. Pagnotta*, 273 Or 420, 425, 541 P2d 483 (1975); *see also Lane County Escrow Serv., Inc. v. Smith, Coe*, 277 Or 273, 285, 560 P2d 608 (1977) ("it is now universally recognized that a constructive trust will arise when stolen or embezzled funds are used to purchase other property"). Plaintiffs rely on *Albino v. Albino*, 279 Or 537, 568 P2d 1344 (1977), although that case used both formulations, first stating that a "resulting trust continued until [the defendant] violated the confidential relationship and refused to pay the sale price of the property to the plaintiffs, when it was converted into a constructive trust," *id.* at 552, then stating that, "[i]f the circuit court can trace the funds into the hands of either or both defendants, it shall impose a constructive trust upon the proceeds," *id.* at 555.

## C.    *Resolving the Confusion*

Since *Barnes*, the *Restatement (First) of Restitution* has been superseded by the *Restatement (Third) of Restitution and Unjust Enrichment*, which we relied upon in our discussion of constructive trusts in *Evergreen West Business Center, LLC*, 354 Or at 801.[5] The new *Restatement*

---

[5] A *Restatement (Second) of Restitution* was attempted but never came to fruition. *See* Kull, 68 Wash & Lee L Rev at 867 (describing that history).

contains a comment expressly dealing with the question of when constructive trusts originate. The answer set out in that comment begins with a statement lending some support to plaintiffs' position:

> "The question is artificial, because it implies that the term 'constructive trust' describes a legal relationship that is either created or decreed; when in fact the words are no more than a judicial shorthand describing the parties' pre-existing interests in particular property. The tendency to ask when the constructive trust is 'created' is encouraged by familiar statements to the effect that a court may 'impose' a trust, or 'subject' the disputed property to a trust in favor of the claimant, or even 'convert the holder of title into a trustee,' but such expressions are merely the magisterial rhetoric of equity."

*Restatement (Third)* § 55 comment e.

That portion of the comment appears to favor plaintiffs, but the *Restatement* subsequently acknowledges that "[t]here is a sense in which the remedial obligation of the constructive trustee does not exist until the court issues its decree" and ultimately adopts a form of agnosticism:

> "The answer to the question posed, therefore, is that the constructive trust 'exists' from the moment of the transaction on which restitution is based; or (if the court prefers) that the constructive trust arises on the date of judgment, but that the state of title it describes 'relates back' to the transaction between the parties. The practical consequence is that the ownership rights of the constructive trust beneficiary, once recognized, are protected from the moment the trustee acquires legal title."

*Id*. We agree with the thrust of that statement. The key point is that, however characterized, "the rights of the claimant are paramount to the rights of the defendant's successors in interest, so long as the latter do not qualify as bona fide purchasers." *Id*. Whether a constructive trust exists from the start or simply relates back is purely terminological.

Although in this case we have been told that it *does* matter, we respectfully suggest that the parties may be treating a linguistic inconsistency as more significant than it is, while looking past a substantive consistency in

our law. Professor Andrew Kull, the Reporter of the Third Restatement, has elaborated on the question at somewhat greater length, in a law review article cited by plaintiffs:

> "'Constructive trust' is a declaratory judgment about property out of place. The necessary condition of constructive trust, and the legal wrong to which the remedy responds, is that ownership, possession, and title to property have been improperly separated. The restitution claimant complains of an involuntary transfer, typically one resulting from fraud, mistake, or coercion: a transfer, in short, that is legally insufficient to bring about a conclusive alteration of property rights. *** If the retained rights need a name, they can be called 'equitable ownership,' or 'an equitable interest,' or simply 'an equity.' Property rights of this character are asserted by means of a claim in restitution."

Andrew Kull, *Restitution in Bankruptcy: Reclamation and Constructive Trust*, 72 Am Bankr LJ 265, 287 (1998).

We find that view, and that use of terminology, to be both persuasive and consistent with our cases. From our earliest cases, we have recognized that the basis for a constructive trust is an equitable ownership right—one that arises out of a transaction that is fraudulent, mistaken, the product of a violation of fiduciary duty, or otherwise results in unjust enrichment. In *Barger*, we explained that, for a constructive trust to arise, it is "the entire ownership, speaking in an equitable sense, that must be established" and that tracing is the process of following that equitable ownership interest as the property changes form. 30 Or at 276-77. In *Barnes*, we quoted the *Restatement (First) of Restitution* for the following principle:

> "'It is true that both in the case of an express trust and in that of a constructive trust one person holds the title to property subject to an equitable duty to hold the property for or to convey it to another, and the latter has in each case some kind of an equitable interest in the property.'"

*Barnes*, 205 Or at 595 (quoting *Restatement (First) of Restitution* § 160 comment a). In explaining the relationship of the constructive trust to that interest, we clarified that a constructive trust "does not create in the party favored by it any new substantive rights"—that is, that the rights

enforced by the constructive trust necessarily predated
its creation. *Accord* Seavey & Scott, 54 LQ Rev at 42 (the
Reporters of the *Restatement (First) of Restitution* suggest-
ing that the "[constructive trust] part of the Restatement
might perhaps more properly have been entitled 'Rights in
Property Created as the Result of a Right to Restitution'").
And we emphasized the same feature in two of the three
elements of a constructive trust that we set out in *Tupper*:

> "First, the plaintiff must show that property or a prop-
> erty interest that rightfully belongs to her was taken or
> obtained by someone else under circumstances that in
> some sense were wrongful or inequitable. *** Finally, the
> plaintiff must establish, with 'strong, clear and convincing
> evidence,' that the property in the hands of that person, *i.e.*,
> the property upon which she seeks to impose a constructive
> trust, in fact is the very property that rightfully belongs to
> her, or is a product of or substitute for that property."

349 Or at 223. Or, as *Tupper* explained in summarizing our
earlier case law,

> "*when a person possesses property that, in equity and good
> conscience belongs to another*, the fact that that person is
> innocent of any affirmative wrongdoing with respect to the
> property will not, standing alone, prevent the equitable
> owner from obtaining a constructive trust."

*Tupper*, 349 Or at 222 (emphasis added).

        The link between the remedy of a constructive
trust and the underlying equitable ownership right already
possessed by the beneficiary is, and has always been, cru-
cial to our constructive trust law. That equitable interest
is, however, distinguishable from the remedial order by the
court. Our past cases sometimes have conflated those two
concepts and used the term "constructive trust" to refer to
both. Thus, as we have documented, our cases refer to a con-
structive trust arising out of parties' actions, using the term
in the first sense, and also state that a constructive trust is
imposed by the court, using the term in the second sense.
In our pre-*Barnes* cases, it made some sense to use the term
"constructive trust" to refer to the fact that the person in
possession of the property lacked an equitable interest in
it. When those earlier cases were decided, this court gener-
ally treated constructive trusts as a species of actual trust,

rather than as a form of equitable remedy. Under that view, it was intuitive to treat constructive trusts, as we do other types of trusts, as a product of earlier actions by the parties, rather than as a creation of the courts.

Our more recent cases, in emphasizing the remedial nature of the constructive trust, demonstrate why it is appropriate to draw a clearer distinction. Having decided that a constructive trust is a form of remedy for unjust enrichment, misunderstanding is most easily avoided if we use the term "constructive trust" to refer only to the remedy imposed by the court. That remedy is not enforcement of a trust that has existed all the while, but a remedial fiction imposed by the court to achieve justice. That generally has been our usage of the term "constructive trust" in our cases since *Barnes*. To the extent that our more recent cases have suggested that a constructive trust emerges from the actions of the parties, that terminology is an artifact of the earlier view of constructive trusts that we rejected in *Barnes*, 205 Or 553. To be clear, however, a remedial constructive trust is still (as constructive trusts have been from the start) based on a preexisting equitable ownership interest. Therefore, while some of our terminology has been inconsistent, none of that inconsistency has been particularly significant.[6]

Although we think that the foregoing discussion answers the Ninth Circuit's question as phrased, we hesitate to leave the matter at that. We do not wish to have inadvertently avoided the reason for the certified question by redefining some terms. One possible objection, discussed

---

[6] As part of its evidence of inconsistency, the Ninth Circuit highlighted two excerpts from the Court of Appeals decision in *Brown v. Brown*, 206 Or App 239, 136 P3d 745 (2006), the first describing constructive trusts as "remedial devices to avoid unjust enrichment when no other adequate remedy is available," *id.* at 251, and the second quoting *McDonald v. McDonald*, 57 Or App 6, 9, 643 P2d 1280, *rev den*, 293 Or 373, 648 P2d 854 (1982), for the proposition that "'[a] constructive trust may be imposed only when the putative trustee holds property which rightfully belongs to another and is thereby unjustly enriched,'" *id.* As should be clear from the foregoing discussion, we see both of those statements as essentially correct, and perceive no conflict between them, much less a difference in case outcomes. Similarly, although plaintiffs frame the question by asserting that there are majority and minority positions on constructive trusts, we have seen nothing to suggest that there are conflicting substantive approaches to constructive trusts among state courts or the various cited treatises, rather than differences in their terminology.

in a case relied on by the government, is that the equitable ownership interest that we have described is just as much a remedial fiction as a constructive trust itself:

> "Because a constructive trust, unlike an express trust, is a remedy, it does not exist until a plaintiff obtains a judicial decision finding him to be entitled to a judgment 'impressing' defendant's property or assets with a constructive trust. Therefore, a creditor's claim of entitlement to a constructive trust is not an 'equitable interest' in the debtor's estate existing prepetition, excluded from the estate under § 541(d)."

*In re Omegas Group, Inc.*, 16 F3d 1443, 1451 (6th Cir 1994). That is a contention advanced most clearly by Professor Emily Sherwin. Emily Sherwin, *Why In re Omegas Group Was Right: An Essay on the Legal Status of Equitable Rights*, 92 BU L Rev 885 (2012).[7]

Professor Sherwin suggests that "two features of property rights—definite rules governing what can be owned and definite rules governing who owns them—are the minimum components of property rights that are capable of operating in rem and supporting transactions between owners and the rest of the world." *Id.* at 889. She acknowledges that

> "equitable title is also a sensible, though limited, legal concept. A beneficiary's interest in an express trust is a common example of a genuine equitable title. Both the thing equitably owned and its owner are defined by determinate rules."

*Id.* at 890 (footnotes omitted). She contends, however, that the divided ownership involved in constructive trust cases "is not a background legal fact recognized by the declaration of a constructive trust, but a remedial conclusion settling a dispute about unjust enrichment." *Id.* at 892. "There has been no intentional division of legal and equitable ownership by recognized procedures in the manner of an express trust." *Id.* (footnote omitted).

---

[7] An earlier article by Professor Sherwin supplied an important portion of *In re Omegas Group*'s reasoning. *See In re Omegas Group*, 16 F3d at 1449 (relying on Emily L. Sherwin, *Constructive Trusts in Bankruptcy*, 1989 U Ill L Rev 297 (1989)).

We disagree with that view, for two reasons. First, as Professor Sherwin acknowledges, that argument relies on "distinctions between concepts that may in fact differ only in degree." *Id.* at 896. Perhaps it is typically true that the holder of legal title or the existence of an express trust is more determinate than whether an unjust enrichment occurred, but those are patterns to be observed in aggregations of cases, not essential properties of the type of right. Rather, the equitable ownership interests at issue in constructive trust cases are the product of longstanding, and determinate, tracing rules that link specific property to unjust enrichment. Second, our cases, both before and after our adoption of the remedial approach to constructive trusts, have acknowledged an actual equitable ownership interest in property—an interest that is vindicated through the remedy of a constructive trust. That interest, like the equitable interest in an express trust, is good against both the current holder of the property and against third parties who are not bona fide purchasers. We reaffirm that framework.

We think that that discussion carries the ball as far as state law can take it. It remains to be "'determine[d] whether the taxpayer's state-delineated rights qualify as "property" or "right to property" within the compass of' 26 USC § 6321." *Wadsworth*, 911 F3d at 997 (quoting *Drye*, 528 US at 58). That, however, is a question of federal law, on which we express no view.[8] It may be that *that* question is not meaningfully different from the question that the Ninth Circuit would face had we answered the certified question differently.[9] Even if our law did label plaintiffs' pre-2008 equitable interest as a constructive trust, that label would not mean anything substantively different than the (more accurate) label that we give it today. Nevertheless, that is the best answer that we are able to provide.

---

[8] For the same reason, although we emphasize that certain passages of *In re Omegas Group*, 16 F3d 1443, do not accurately reflect Oregon law, we do not mean to suggest that they are inaccurate statements of how federal bankruptcy law would apply to those property interests.

[9] That is, if we had concluded that a constructive trust originates at the time of the transaction, the Ninth Circuit would still need to decide whether a prejudgment constructive trust is too inchoate to render plaintiffs owners for the purposes of the federal tax lien statute.

## III.   WHEN THE INTEREST ORIGINATED

The second issue briefed by the parties is one that we added in reformulating the question. Again, that additional issue was, as further reframed in light of our analysis of the first issue:

> "If plaintiffs' equitable ownership interest arises at the moment of the purchase of a property with fraudulently obtained funds, does it make any difference if the fraud as to the party seeking establishment of a trust occurred after the initial purchase?"

That, too, is a question of state law on which the parties disagree. It is not entirely certain, however, that the answer will prove dispositive to the Ninth Circuit's resolution of this case. If the Ninth Circuit decides that any equitable interest of plaintiffs would be too inchoate to defeat the tax lien, then the particulars of that interest will not matter. Despite that uncertainty, the question satisfies the requirement that "our decision must, in one or more of the forms it could take, have the potential to determine at least one claim in the case." *Western Helicopter Services*, 311 Or at 365. We think it prudent to answer the question for several reasons: It has already been briefed by the parties; clarifying the nature of plaintiffs' interest may be helpful to the Ninth Circuit in deciding how the federal tax lien statute, 26 USC § 6321, applies to that interest; and—not being sure of the course that this case will take from here—it serves the interest of judicial economy to render a decision now, rather than to have the parties litigate it again later.

The problem presented here is less a question of unjust enrichment—plaintiffs have stated such a claim—than it is of tracing. At issue is whether plaintiffs' interest in the money that they transferred to Talmage can be traced into an ownership interest in the RiverCliff property—one that existed prior to 2008. Recall that Talmage and his wife purchased RiverCliff in 1997 using client funds and, between 1998 and 2006, Talmage used client funds to improve the property and to purchase his wife's half share in the property in 2005, after their divorce. Plaintiffs first invested with Talmage in 2002. Plaintiffs' funds were used to pay for improvements, to purchase Talmage's wife's share,

and to repay funds Talmage had received from pre-2002 investors. The parties agree that plaintiffs' funds are traceable to at least the half-interest in RiverCliff that Talmage purchased from wife in 2005, after their divorce. Plaintiffs offer three theories of when and how they acquired an equitable ownership interest in the other half of RiverCliff: (1) when Talmage used money fraudulently obtained from plaintiffs to improve RiverCliff; (2) when Talmage transferred RiverCliff to a corporation that he controlled, for no consideration; and (3) by subrogation, when Talmage paid off the earlier victims of his scheme using plaintiffs' funds.

The first two theories are easily disposed of. When Talmage used plaintiffs' funds to make improvements in RiverCliff, that act gave plaintiffs an interest in the property, but not an *ownership* interest for which a constructive trust would be an appropriate remedy. Instead, they have recourse to an equitable lien. As the *Restatement* explains:

> "Unjust enrichment is susceptible to remedy by constructive trust when the defendant holds title to property to which the claimant has an equitable claim of ownership. *** By contrast, equitable lien requires only that the asset in question incorporate value obtained from the claimant to a significant and measurable degree. The two remedies are typically distinguished (but occasionally confused) when the claimant's assets have been used by the defendant to improve property rather than to acquire it."

*Restatement (Third)* § 55 comment k. The fact that Talmage used a large amount of plaintiffs' funds to improve RiverCliff is relevant to the extent of the equitable lien they may have on the property, but does not allow plaintiffs to seek a constructive trust.

Similarly, Talmage's transfer of the property from his personal ownership to a corporation that he controlled did not change the nature of the interest that plaintiffs had in the property. Plaintiffs allege that the transfer was made without consideration and that the entity now holding legal title to the property (and its parent corporation) are controlled by Talmage. Both of those entities are defendants in the federal action. Yet, the fact that Talmage initiated a paper transaction to transfer the property from himself

to an entity that he controlled, without consideration, at a time when he was holding funds fraudulently obtained from plaintiffs, does not make RiverCliff "property or funds that 'can be traced and followed' from the specific property" in which plaintiffs had an equitable ownership interest. *Evergreen West Business Center, LLC*, 354 Or at 804 (quoting *Ferchen v. Arndt*, 26 Or 121, 129, 37 P 161 (1894)).

However, plaintiffs' subrogation theory is viable. As we have explained:

> "'Subrogation is the substitution of another person in place of the creditor to whose rights he succeeds in relation to the debt, and gives to the substitute all of the rights, priorities, remedies, liens and securities of the party for whom he is substituted. *** [W]here one has been compelled to pay a debt which ought to have been paid by another, he is entitled to exercise all of the remedies which the creditor possessed against the other ***.'"

*Maine Bonding v. Centennial Ins. Co.*, 298 Or 514, 521, 693 P2d 1296 (1985) (quoting *United States F. & G. Co. v. Bramwell*, 108 Or 261, 277, 217 P 332 (1923)). The right to subrogation includes "the right to follow trust funds, to enforce liens, to enforce a mortgage, and to enjoy any priority that the subrogor enjoyed, not only as to the person against whom claim is made, but against other creditors, as well." *State ex rel Healy v. Smither*, 290 Or 827, 836-37, 626 P2d 356 (1981). Rights of the former creditor to which a claimant may potentially be subrogated include claims and remedies in restitution. *See Restatement (Third)* § 57 comment d (so stating).

As alleged in the complaint, the RiverCliff property was purchased exclusively with the funds of Talmage's earlier victims. Those victims therefore had an equitable ownership interest in the property, and a remedy for Talmage's unjust enrichment at their expense through a constructive trust. When Talmage paid the same earlier victims back with funds fraudulently obtained from plaintiffs, the earlier victims' equitable ownership interest in the property was subrogated to plaintiffs, to the extent of the repayment. *See Restatement (Third)* § 57 ("Recovery via subrogation may not exceed reimbursement to the claimant."). As a consequence,

plaintiffs can take advantage of the same constructive trust remedy.

The certified question is answered.